Filed 3/18/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

RAMIRO GONZALES,

        Defendant and Appellant.

S191240

Ct.App. 6 H032866

Santa Clara County
Super. Ct. No. 211111

        We granted review in this case to determine whether the trial court properly applied the psychotherapist-patient privilege with regard to statements made by a parolee to his therapist during parole-mandated therapy sessions and, if not, whether the trial court's error constitutes a violation of a federal constitutional right of privacy as well as a violation of the state statutory privilege.

        In January 2007, the Santa Clara County District Attorney filed a petition seeking to commit defendant Ramiro Gonzales as a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.). Prior to the commencement of trial in the SVPA proceeding in 2008, the district attorney sought to obtain access to psychological records of defendant that had been compiled during outpatient psychological evaluation and counseling sessions in which defendant had participated as a condition of parole. Defendant opposed such disclosure as a violation of California's statutory psychotherapist-patient privilege. (Evid. Code, § 1010 et seq.) The trial court

1

concluded that disclosure of such records to the prosecution and its expert witnesses in an SVPA proceeding was permissible under the dangerous patient exception to the psychotherapist-patient privilege (Evid. Code, § 1024) and ordered the requested disclosure. Thereafter, just prior to trial, the trial court further determined, again on the basis of the dangerous patient exception, that the therapist who had provided one-on-one counseling to defendant during the counseling sessions would be permitted to testify at the SVPA trial regarding statements made by defendant to the therapist during those counseling sessions. At the conclusion of trial, the jury found that defendant was an SVP within the meaning of the SVPA and the trial court committed defendant to the custody of the State Department of Mental Health (now State Department of State Hospitals) for an indefinite term.

On appeal, the Court of Appeal reversed. The Court of Appeal first concluded that the trial court erred in ordering disclosure of defendant's psychological records and permitting defendant's former therapist to testify to statements made by defendant during his counseling sessions. The Court of Appeal then determined that the trial court's error constituted not only state law error but also a violation of defendant's federal constitutional right of privacy. Because the Court of Appeal was of the view that the trial court's action constituted federal constitutional error, it held that the question whether the admission of the challenged evidence was prejudicial must properly be evaluated under the stringent beyond a reasonable doubt prejudicial error standard generally applicable to federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18 and its progeny. Applying that strict prejudicial error standard, the Court of Appeal held that the trial court error required reversal of the order of commitment.

2

The People sought review in this court, contending that the Court of Appeal was mistaken both in finding that the trial court erred in ordering disclosure of the psychological records and admitting the former therapist's testimony, and further in concluding that the asserted error violated the federal Constitution. We granted review to address both issues.

For the reasons discussed hereafter, we agree with the Court of Appeal's conclusion that the trial court erred in permitting disclosure of defendant's psychological records and in admitting his former therapist's testimony in reliance upon the dangerous patient exception to the psychotherapist-patient privilege. We disagree, however, with the Court of Appeal's determination that the trial court error in this regard constitutes an error of federal constitutional dimension, and thus we conclude that the prejudicial nature of the error must properly be evaluated under the usual prejudicial error standard applicable to state law error set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, namely, whether it is reasonably probable that the error affected the result. Applying that standard, we conclude that the trial court error was not prejudicial and does not require reversal of the trial court judgment.

**I. Summary of Facts and Proceedings Below**

**A. Defendant's Background and Events Preceding His 2004 Parole**

Defendant was born on February 18, 1955, and was 53 years old at the time of the 2008 trial of the SVPA proceeding at issue in this case. At age seven, defendant contracted spinal meningitis, which caused him to suffer significant intellectual and developmental disabilities, and thereafter he attended special education classes and needed help with daily living chores. (In psychological testing conducted many years later, defendant was determined to have a full IQ score of between 65 and 71.) He ultimately dropped out of high school, continued to live at home with his mother, received Social Security benefits as a result of his

3

disability, and earned some money collecting cans for recycling and doing simple yard work.

In April 1975, at age 20, defendant was convicted of his first sex offense. As described in the probation report, defendant, while mowing the lawn at a home where a five-year-old girl lived, was seen hugging the girl and when he let her go he was observed with an erection. The girl reported that while defendant was hugging her he whispered obscenities in her ear. As a result of that incident, defendant was convicted of misdemeanor annoying or molesting a child. (Pen. Code, § 647.6.)

Two years later, in April 1977, defendant again committed a somewhat similar offense with another young girl. In that incident, after defendant had finished mowing the lawn of a home where a seven-year-old girl lived, the girl's mother invited defendant into the house in order to obtain defendant's phone number so she could pay him at a later date. Once inside, defendant asked to use the telephone and then pretended to make a phone call, making the girl's mother suspicious. The mother telephoned her brother and asked him to come to her house and then went outside to wait for her brother to arrive. When the mother reentered her house, she found defendant on the couch with her seven-year-old daughter, touching the girl's buttocks and crotch area over her clothing. When asked to explain his conduct, defendant said that it "looked easy," that he did not know how to "do sex" with women, and that he had "got hot" after the mother had left the house. As a result of that incident, defendant was convicted of lewd and lascivious conduct with a minor (Pen. Code, § 288, subd. (a)) and was placed on probation with conditions including confinement in county jail, and registration as a sex offender pursuant to Penal Code section 290.

Seventeen years later, in August 1994, when defendant was 39 years old, defendant was convicted of another sex offense with a young girl. On that

4

occasion, defendant was at his sister's house for a celebration of a child's baptism. During the party, a friend of defendant's sister put her four-year-old daughter to sleep in one of the bedrooms. Defendant was later found in the bedroom rubbing the young girl's vaginal area over her underpants while she slept; upon his arrest, defendant attributed his behavior to his being very drunk. As a result of that conduct, defendant was again convicted of lewd and lascivious conduct with a minor (Pen. Code, § 288, subd. (a)), and this time was sentenced to a determinate term of 11 years in prison.

Prior to defendant's scheduled release from prison on parole in the spring of 2004, the Santa Clara County District Attorney filed a petition seeking to have defendant civilly committed under the SVPA. After a trial, however, a jury unanimously found not true the allegation that defendant was an SVP within the meaning of the SVPA, and as a result defendant was not subjected to an SVPA commitment at that time.

**B. Defendant's 2004 Parole Conditions and Conduct on Parole**

On May 28, 2004, defendant was released on parole under conditions that barred his use of alcohol, contact with sex offenders, contact with minors, and being within 100 feet of places where children congregate, including parks and schools. Because his mother's residence was too close to a school, defendant was not permitted to live at his mother's house, but he was allowed to visit her there. Most significantly for the issue presented in this case, as an additional condition of parole defendant was required to attend outpatient psychological evaluation and treatment as directed by his parole agent.

In January 2006, defendant's parole agent took defendant to the Atkinson Assessment Center (Atkinson Center) for outpatient treatment and counseling pursuant to defendant's parole condition. At the Atkinson Center, Pat Potter McAndrews, a certified psychologist, was defendant's psychotherapist; Dr. Carol

5

Atkinson, the head of the Atkinson Center, was McAndrews' supervisor. As we shall see, a principal issue presented by this case is whether statements made by defendant to McAndrews as part of the evaluation, treatment and counseling process at the Atkinson Center and records kept by the Atkinson Center reflecting such statements are protected by the psychotherapist-patient privilege embodied in the Evidence Code and should not have been disclosed to the prosecution and admitted into evidence over defendant's objection at defendant's subsequent SVPA proceeding.

While on parole, defendant committed a number of parole violations that resulted in his arrest, brief confinement, and rerelease on parole on three occasions between July 2004 and December 2005. In July 2004, defendant was arrested for missing an outpatient meeting, but was released in August 2004 when it turned out that defendant had mistakenly gone to his parole agent's office instead of to his outpatient meeting because he thought he was supposed to check in with his parole agent, and thereafter had returned home when his parole agent was not at his office. In February 2005, defendant was arrested when his parole agent found six unopened and 20 opened and empty beer cans in his motel room and defendant admitted that he had been drinking; after four months in jail, he was rereleased on parole in June 2005. In August 2005, he was again arrested for drinking when a breathalyzer test showed a blood-alcohol level of .05 percent; defendant was rereleased on parole in December 2005.

In April 2006, defendant was fitted with a GPS tracking device and specifically agreed not to have contact with anyone under the age of 18 and to report any such contacts he had with a minor, whether the contact was accidental or not. On August 11, 2006, defendant's parole agent, in checking the records obtained from defendant's GPS device, discovered that the previous day defendant had been at a park with a playground for about 30 minutes. The agent checked

6

defendant's GPS device, learned that he was currently at his mother's house, and telephoned defendant there to ask about the prior day's incident. While on the phone with defendant, the agent could hear children's voices in the background. Without alerting defendant, the agent and other officers immediately drove to defendant's mother's home and found two children (defendant's niece and nephew), ages seven and four, at the house, along with the children's mother and father (defendant's sister and her boyfriend/partner), defendant's mother, and defendant.  (Defendant's sister later explained that she and her family had recently moved into her mother's house after they had been evicted from their own apartment.)  When the agents arrived, the two children were in the front yard with their father, while defendant was in the side yard.

When questioned by his parole agent, defendant acknowledged that he knew he was not supposed to be near the playground on the previous day, but said he had just stopped at the park to roll some cigarettes and did not look at any of the children.  Defendant also admitted that he knew he was not supposed to be at his mother's house when children were there and further admitted that over the past few weeks he had at times been at the house when all four of his sister's children were present.  In addition, defendant acknowledged to his parole agent that during the previous three months (from June to August 2006) he had regularly drunk beer about three times a week.  The parole agent arrested defendant for violating parole and took him into custody.

### C. SVPA Proceedings

#### 1. Pretrial Proceedings

While defendant was in custody for the August 2006 parole violations, the California Department of Corrections and Rehabilitation referred defendant for screening as a potential SVP pursuant to Welfare and Institutions Code section 6601.  Two psychologists, Thomas MacSpeiden and Jack Vognsen, employed

7

under contract with the State Department of Mental Health (now State Department of State Hospitals), evaluated defendant in late 2006. At the subsequent probable cause hearing, both psychologists testified that defendant suffered from pedophilia and that the disorder impaired his emotional and volitional capacity. Although both psychologists acknowledged that, in conformity with the holding in the Court of Appeal decision in *Turner v. Superior Court* (2003) 105 Cal.App.4th 1046 (*Turner*), they accepted as true the earlier jury finding at defendant's prior SVPA proceeding that, as of May 2004, defendant was not likely to reoffend if he were not confined for treatment, both stated that they felt that defendant's four parole violations since May 2004 constituted materially changed circumstances that demonstrated defendant's decreasing control over his behavior and indicated that, as of the date of their separate evaluations in late 2006, defendant was likely to engage in sexually violent criminal acts without appropriate treatment and custody. (See Welf. & Inst. Code, § 6601, subd. (d).) At the conclusion of the hearing, the court found that there was probable cause to believe defendant met the requirements of an SVP and ordered that a trial be conducted to determine whether defendant was an SVP.

Prior to the commencement of trial in the SVPA proceeding, the district attorney sought to subpoena all records in the possession of the Atkinson Center pertaining to the evaluation and treatment of defendant. Defense counsel filed a motion to quash the subpoena.

At the hearing on the motion to quash, the defense maintained that the records sought by the prosecution were protected by the psychotherapist-patient privilege and could not be disclosed over defendant's objection. Defense counsel relied heavily upon the Court of Appeal opinion in *Story v. Superior Court* (2003) 109 Cal.App.4th 1007 (*Story*), where the appellate court concluded that psychotherapy records relating to therapy sessions engaged in as a condition of

8

probation were protected by the psychotherapist-patient privilege and could not be obtained by a prosecutor who sought the records for use in a subsequent murder prosecution of the patient.

In response, the district attorney argued first that he had been informed by both Dr. Atkinson and defendant's parole agent, and would make an offer of proof, "that it is standard practice for a parolee to sign a consent form acknowledging that the confidentiality of sex offender treatment is limited and qualified to some degree due to the special relationship between the parolee, the treater, and the parole agent," and so "it is possible that the privilege does not apply based on the consent" of defendant. Second, the district attorney maintained that even if the psychotherapist-patient privilege had not been waived, the records of defendant's prior evaluation and treatment at the Atkinson Center fell within the so-called dangerous patient exception to the psychotherapist-patient privilege embodied in Evidence Code section 1024 and thus were properly discoverable by the prosecution. In support of the latter claim, the district attorney relied on the Court of Appeal decision in *People v. Martinez* (2001) 88 Cal.App.4th 465, which held that records of prior inpatient psychotherapy treatment conducted during a mentally disordered sex offender (MDSO) commitment were properly admitted in a subsequent SVPA proceeding.

At the conclusion of the hearing, the trial court determined that although the psychotherapist-privilege applied to the records in question, the prosecution was entitled to obtain access to the records under the dangerous patient exception to the privilege. Accordingly, the court denied the defense motion to quash the subpoena. Because the trial court relied upon the dangerous patient exception, it did not reach or resolve the district attorney's alternative theory that defendant had consented to the disclosure of such materials as part of the standard parole outpatient therapy procedure.

Just prior to the commencement of the SVPA trial, defense counsel renewed the objection to the disclosure of the Atkinson Center's records to the district attorney and to the evaluating psychologists. In addition, defense counsel objected to the district attorney's proposal to call McAndrews as a witness at trial to testify to statements defendant had made during therapy and counseling sessions with McAndrews, maintaining that such testimony would also violate the psychotherapist-patient privilege. The trial court denied both objections on the same ground that it had denied the motion to quash the subpoena — namely, that disclosure was permissible by virtue of the dangerous patient exception.

## 2. SVPA Trial — Prosecution Case[1]

At trial, the two psychologists (MacSpeiden and Vognsen) who had testified at the probable cause hearing testified again about their evaluations, diagnoses and conclusions regarding defendant's condition and potential dangerousness. MacSpeiden testified that in his opinion defendant suffered from pedophilia and alcohol dependence, and that although defendant had a cognitive deficiency, he (MacSpeiden) was of the view that defendant should not properly be characterized as mentally retarded but instead as borderline intellectual functioning. MacSpeiden further testified that in his view defendant's pedophilia affected his emotional or volitional control in a way that predisposed him to commit sexual criminal acts such that he is a menace to the health and safety of others, rendering him an SVP under the provisions of the SVPA. In the course of his testimony, MacSpeiden stated that he had reviewed a report prepared by

---

[1]    Because one of the issues before this court concerns whether any error committed by the trial court was prejudicial, we set forth the evidence presented at trial in some detail.

10

Dr. Atkinson (the Atkinson report), which stated that defendant, in summarizing his "psychosexual history," had told McAndrews that he had engaged in "child molestation beginning at age 14 and ending at age 37 with 16 victims, having 18 separate acts." MacSpeiden indicated that he had prepared his own initial report regarding defendant before receiving and reviewing the Atkinson report, and that the information in that report "[e]ssentially corroborat[ed]" his own opinion. As at the probable cause hearing, MacSpeiden testified at trial that although in May 2004 a jury had unanimously determined that defendant was not an SVP, his (MacSpeiden's) conclusion that defendant currently met the requirements of an SVP was based on what MacSpeiden viewed as a material change in defendant's circumstances as evidenced by defendant's conduct after May 2004.

Vognsen similarly testified that on the basis of his review of defendant's criminal background, the results of psychological testing, and his two personal interviews of defendant, he diagnosed defendant as suffering from pedophilia and alcohol dependence, and that as a result of his pedophilia defendant posed a serious danger of committing another sexual offense with children. Like MacSpeiden, Vognsen recognized that, in light of the jury finding in the earlier SVPA proceeding and the decision in *Turner*, *supra*, 105 Cal.App.4th 1046, his conclusions regarding the seriousness of the risk defendant posed to others could properly be based only on events occurring after the prior SVPA proceeding. Nonetheless, Vognsen testified that in his opinion defendant's parole violations in the years following the earlier SVPA proceeding "indicate very impaired ability to control his behavior, to think about what he's doing, and to decide not to do certain things that are dangerous, and he's a danger." Phrasing his conclusions in terms that tracked the legal standard established by the governing judicial decisions (see *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 255; *People v. Roberge* (2003)

11

29 Cal.4th 979, 987), Vognsen stated that in his view there was "a substantial and well-founded risk" that defendant would again commit "a sexually violent offense," a category that, by statute, is defined to include any sexual offense against a minor under the age of 14 (Welf. & Inst. Code, § 6600.1). When questioned by the district attorney whether he found significant the statement in the Atkinson report that defendant had stated that between the time he was 14 years of age and the time he was 37 years of age he had touched 16 children, Vognsen answered that he did "[b]ecause this is a large number of victims . . . [and] goes to demonstrating his constant and impulsive offending in a sexual manner throughout his life span." Further, when pressed by defense counsel whether defendant's sexual touching of children might be attributable to his mental retardation and consequent social awkwardness with adults rather than pedophilia, Vognsen replied: "I would go along with that if we had, say, one, maybe even just two instances of inappropriate sexual behavior, especially if those instances had occurred fairly early in the Respondent's experience. But the fact that we have at least three, and possibly as many as 16 different victims and that they have occurred throughout this man's life, at least up to the age of 39, indicates to me that his retardation is coupled with a sexual interest in kids."

In addition to the two evaluating psychologists, the prosecution also called as a witness McAndrews, the psychologist who had counseled and treated defendant on an outpatient basis at the Atkinson Center from January 24, 2006 through August 2006 while defendant was on parole. (As noted, the trial court earlier overruled defendant's objection to the admission of McAndrews's testimony.) McAndrews reported that defendant regularly attended his scheduled group and individual counseling sessions, that she and defendant established a comfortable "therapeutic rapport," and that her individual sessions with defendant uniformly "went well," "[m]eaning that I had created an environment where the

12

therapeutic process could continue. We were making progress. We're trying to help Mr. Gonzales understand a little bit more about himself and his needs and perhaps learn not to reoffend in the future."

In the course of her testimony, McAndrews reported many statements made by defendant throughout the eight-month counseling process, including defendant's admission "that he was very attracted to children, small children, and that especially when he was drinking that he found that he couldn't really control himself and would have an overwhelming desire to touch them," and his statement, in response to a question as to how many times between the ages of 14 and 37 he had molested children, that "he had had 16 victims and he thought there were about 18 crimes." McAndrews also testified that when defendant was asked during therapy to write about why he was required to undergo sexual offender treatment, defendant wrote: "I would just like to stop thinking about 16-year-old girls and think of pretty women from the age of 45 years of age or older on my birthday. I will be 51 years old. That is what I would like." McAndrews further stated that in their counseling sessions defendant had told her that he "had not had a drink since he'd gotten out of prison," had not told her that he had been at his mother's house at a time when his nieces and nephews were there, and that if she knew that "he was at his mom's house when kids were there and he was drinking," she would be concerned because "[t]hat would be a recipe for a sex offense."

On cross-examination, McAndrews acknowledged that over the entire eight-month counseling process defendant had not missed a single group or individual counseling session (there were 85 group sessions and eight individual sessions during this period), that no suspicion had been raised that defendant was then molesting children, and that McAndrews had no intention of removing him from the outpatient therapy program for noncompliance or noncooperation. McAndrews also testified that on a number of occasions defendant, in reporting

13

his sexual history, stated that in the past he had sexually touched four, rather than 16, young girls, and that the sole instance in which he stated that he had sexually touched 16 different children occurred during her administration of a lengthy (79-page) assessment test (the Abel Assessment test) that employed about 250 multipart questions. McAndrews indicated, however, that she was confident defendant understood the question.

The parole agent who supervised defendant during the period at issue in this case also testified on behalf of the prosecution. The agent testified that he felt that he had a good relationship with defendant, and recounted for the jury each of defendant's parole violations described earlier in this opinion (*ante*, pp. 6-7): (1) defendant's failure to attend an outpatient meeting because of a misunderstanding as to where he was to go, (2) defendant's drinking beer in his room, (3) defendant's use of alcohol as evidenced by a positive blood-alcohol test, and (4) defendant's presence in a park containing a playground on August 10, 2006, and his presence at his mother's home when children were there on August 11, 2006, along with defendant's admission on that date that he had drunk beer three times a week over the past few months.

The prosecution also called defendant to testify as a witness at trial. In the course of defendant's brief testimony, the district attorney asked defendant whether "it [was] okay" for him to drink beer when he was on parole. When defendant answered "No," and the district attorney asked "Why not?," defendant stated: "Because it would have — it would give me visions of little kids, and then, like, if I didn't — if I did not remember that I should not be drinking." (As discussed below, the district attorney highlighted this portion of defendant's testimony in his closing argument to the jury.)

14

### 3. SVPA Trial — Defense Case

In defense, defendant's mother testified to defendant's childhood illness and very limited personal skills, describing his need for assistance in dressing, grooming, cooking, and other ordinary activities of everyday life. She testified that after defendant stopped attending high school, he made some money collecting cans for recycling and doing occasional simple gardening jobs for friends and neighbors and received Social Security benefits as a result of his mental disability. She stated that defendant lived with her until he was sentenced to prison at age 39. When asked about what defendant would do at her house when he visited during the time he was on parole, she said that he would go in the yard and package cans for recycling and smoke and drink beer. She acknowledged that after her daughter's family moved into her house, defendant would occasionally visit while some children were at the house, but she stated that defendant would stay in the backyard listening to music, smoking and drinking beer, and she emphasized that she had never seen defendant touch any of the children. On cross-examination, defendant's mother acknowledged that although defendant's parole officer had told her that there should be no drinking and no children when defendant visited her at her home, she could not stop him from drinking beer because "[h]e won't mind me anyway even if I tell him. He won't mind me."

Defendant's sister, Gloria, who was living at defendant's mother's house at the time of defendant's August 2006 arrest for parole violations, testified that she and her family had moved into her mother's house a few weeks before the arrest after her family had been evicted from their own apartment. She testified that defendant had come to her mother's house about three times a week during that period, usually stayed for only an hour or two, and never touched any of her children. On cross-examination, Gloria stated that she made a point of keeping

15

her eye on her children when defendant was visiting, and, when asked why she did that, she stated: "Because of what happened. [Q]: You mean because of the reason he'd been in prison? [A]: Right."

A defense investigator testified regarding the geographic details of the park/playground area at which defendant's GPS device had indicated that he had briefly stopped on the day prior to his arrest. The investigator indicated that the park was extremely large and had many areas with benches and tables that were not immediately adjacent to the children's playgrounds. The investigator also noted that a community center at which meals were regularly served on a walk-in basis to needy persons was located about two blocks from the park in question.

A service coordinator for the San Andreas Regional Center, a state-funded entity that provides services to developmentally disabled persons, testified that defendant was one of his clients and had qualified for services at the center on the basis of his mental retardation and specific deficiencies in communication, learning, self-direction, capacity for independent living and economic self-sufficiency. The service coordinator testified about an individual program plan, prepared specifically for defendant, that proposed defendant be provided 24-hour care and supervision and skills training and that such services, including residence in a group home with a ratio of one staff member to two or three clients, would be appropriate for defendant at that time. On cross-examination, the coordinator acknowledged that he was not aware that defendant's parole term had ended and that, if defendant were released from custody, defendant would not be under the additional supervision of a parole officer. The coordinator conceded that this would impose an additional supervision burden on the center, but stated that he had been successful in working with such sexual offenders in the past.

The defense also called two psychologists who had interviewed and evaluated defendant at the defense counsel's request after the initiation of this

16

SVPA proceeding. Timothy Derning, who had considerable experience dealing with mildly retarded or developmentally disabled persons, testified to the considerable limitations facing such persons. When asked if defendant, who had become used to visiting his mother regularly while he was on parole, would have had difficulty knowing what to do when his sister and her children unexpectedly moved in with his mother, Derning testified that the problem would have been very difficult for defendant to recognize or to adjust to, and that it would have been beyond defendant's intellectual capabilities to put in place a plan in which he would call his mother first to make sure no children would be at her house when he visited. Derning also stated that in his view defendant would have great difficulty in understanding many of the complicated questions using sophisticated vocabulary that were included in the psychological tests that were administered and relied upon by the evaluating psychologists who testified on behalf of the prosecution, and in particular the questions that asked defendant at what age he first became "sexually aroused by touching a child" and the number of children he had "touched sexually" in his lifetime. In general, Derning testified that he believed that the evaluating psychologists, in administering tests and in diagnosing defendant's condition, had not given adequate weight to defendant's mental retardation in concluding that defendant suffers from pedophilia, and that defendant's occasional inappropriate touching of children could reasonably be explained by his mental retardation and his consequent difficulty in forming intimate social relationships with persons of his own age, rather than by pedophilia.

Brian Abbott, a licensed clinical psychologist and social worker who had evaluated and counseled a substantial number of sex offenders, also testified for the defense. Abbott explained that in light of his review of records concerning defendant's family background and psychological testing and his numerous

17

personal interviews with defendant, he determined that defendant did not suffer from pedophilia. When asked what would have caused defendant to engage in three acts of sexually touching female children, Abbott stated that in his view because defendant "suffers from mild mental retardation and because of the lack of impulse control and judgment associated with that disorder, he acted out his sexual feelings in an inappropriate way towards a child who was accessible at that point in time." In response to a question whether defendant currently has the ability to manage his sexual feelings better than in the past, Abbott stated that he believed defendant now does have better control, pointing to the fact that "since his release from prison there's been no indication that he has tried to do anything sexual with a child" and to the fact that his current age (over 50) is associated with a decrease in sexual drive. He also stated that he was unaware of any statements made by defendant indicating that he felt sexually aroused by or intended to engage in sexual activity with children since his release in 2004,[2] and noted that although defendant's residence was subject to parole searches there was no indication that defendant possessed any child pornography or magazines or other material suggesting that defendant harbored an erotic interest in children. In sum, Abbott concluded that in his view there was no change in circumstances since the prior SVP proceeding in which defendant was found not to be an SVP indicating that there was a danger that defendant would engage in predatory sexual behavior.

---

[2]    When Abbott was asked about the note defendant had written during his treatment at the Atkinson Center in which he said he would like to stop thinking of 16-year-old girls and would like to think of pretty women from the age of 45 years of age or older, he stated that even if defendant was referring to thinking about 16-year-old girls sexually, the statement would not suggest that defendant suffered from pedophilia because 16-year-old girls are generally not prepubescent, and thus such thoughts would not support a diagnosis of pedophilia.

18

In addition, Abbott discussed at some length other studies that, in his view, demonstrated the unreliability or limited usefulness of the psychological tests that had been relied upon by the evaluating psychologists who had testified on behalf of the prosecution.

### 4. Closing Arguments

The district attorney began his closing argument by directing the jury's attention to defendant's in-court testimony in response to the question why it was not all right for him to drink beer while on parole: " 'because it would give me visions of little kids.' " Describing this evidence as "chilling," the district attorney argued that, in light of the overall facts in this case, there was not "any other explanation for visions of little kids given what we know about [defendant] other than the interpretation of great concern that I . . . respectfully suggest to you is there" — namely that defendant suffers from pedophilia and poses a serious and well-founded risk of reoffending in a sexually predatory manner. In the course of his closing argument, the district attorney also stated: "I started out with the real concern . . . about the 16 victim statement. But in fact you heard so much about what he did and did not tell his parole officer and sex offender counselor, . . . what he did not tell, I'm drinking. I'm going home and drinking. I am there when there are kids." The district attorney additionally reminded the jury that "[t]he family tells [one of the defense psychologists] and others now we never let him out of our sight. Sister, baby sister told you . . . ." The district attorney concluded: "I submit that it has been shown beyond a reasonable doubt that this man suffers a serious but dangerous condition which isn't going to go away."

In his closing argument, defense counsel emphasized the prior jury verdict finding defendant not to be a danger to commit a future sexually violent crime as of May 27, 2004, and maintained that the prosecution had not proved, beyond a reasonable doubt, the existence of materially changed circumstances occurring

19

after that date indicating that defendant was likely to commit a sexually violent offense. Counsel argued in this regard that defendant's drinking beer was not a new circumstance (observing that defendant had regularly been drinking beer since he was a teenager), that even defendant's parole agent acknowledged that defendant's normal daily routine — riding the bus, going to the market, eating at the soup kitchen — would invariably bring defendant around children, and that the prosecution had introduced no evidence that, during the time in which he was living in the community after May 27, 2004, defendant had ever touched or attempted to touch any child, either at the park where he stopped for 30 minutes on October 10, 2006, at his mother's house, or at any other time. Stressing defendant's limited mental ability, counsel argued that the fact that defendant had continued to visit his mother several times a week even after his sister and her children had moved in with his mother did not indicate that defendant posed an increased danger, but simply reflected defendant's limited ability to devise a new plan or schedule on his own. Finally, defense counsel drew the jury's attention to the evidence introduced at trial indicating that defendant, because of his disability, would be eligible for lifelong services through the San Andreas Regional Center that would include living at a group home with other developmentally disabled adults, and argued that defendant did not pose a substantial risk of reoffending, particularly in light of his advanced age and the fact that he had not committed any offense in the years since May 2004.

### 5. Jury Instructions

Following closing arguments, the court instructed the jury on the applicable legal principles that it was to apply in resolving the case. After setting forth the numerous elements that the prosecution was required to prove beyond a reasonable doubt in order to establish that defendant is a sexually violent predator, the court instructed the jury regarding the effect of the judgment in the prior SVPA

proceeding in which defendant was found not to be a sexually violent predator. The court informed the jury: "[Defendant] was found not to be a danger to commit a future sexual violent crime on May 27, 2004. You, the jury, must accept this to be true as of [that date]. Before a verdict finding [defendant] is likely to commit a future sexually violent crime can be returned, the District Attorney must prove beyond a reasonable doubt that there are materially changed circumstances that have occurred since [that date] that now make [defendant] a likely danger to commit a sexually violent offense. If you find that materially changed circumstances which make [defendant] likely to commit a sexually violent offense have not been proven beyond a reasonable doubt to have occurred since [that date], then you must find that [defendant] does not qualify as a sexually violent predator."

### 6. Jury Deliberations and Verdict

During its deliberations, the jury asked that the trial testimony of defendant and of defendant's sister Gloria be reread. The following morning, the court reporter provided the requested readback of testimony in the jury deliberation room. Later that morning, the jury returned its verdict, finding defendant to be an SVP within the meaning of Welfare and Institutions Code section 6600. After the jury was polled and unanimously affirmed the verdict, the trial court signed an order committing defendant as an SVP under the SVPA.

### D. Court of Appeal Decision

In the Court of Appeal, defendant challenged the judgment on a number of grounds. First, defendant maintained that the trial court erred in authorizing the disclosure of defendant's psychological records at the Atkinson Center to the district attorney and the evaluating psychologists and in permitting McAndrews to testify at trial regarding statements that defendant made to her during counseling sessions. Second, he argued there was insufficient evidence to support a finding

21

of a material change in circumstances after the prior SVPA proceeding at which a jury determined that he did not meet the requirements for commitment under the SVPA. Third, he claimed the trial court erred in refusing to instruct the jury that mental retardation could not be considered a mental disorder for purposes of the SVPA. Fourth, he argued that the provisions of the SVPA authorizing indefinite commitment violate a number of distinct constitutional guarantees, including equal protection, due process, ex post facto, double jeopardy, and the right to petition for redress of grievances.

The Court of Appeal reached only the first of these contentions. The appellate court unanimously concluded (1) that the trial court had erred in ordering disclosure of defendant's psychological records to the prosecution and in admitting the testimony of defendant's former therapist at trial, (2) that this error constituted not only state law error but also a violation of defendant's federal constitutional right of privacy, and (3) that the error was prejudicial and required reversal of the trial court's commitment order under the stringent beyond a reasonable doubt prejudicial error standard applicable to federal constitutional error under *Chapman v. California*, *supra*, 386 U.S. 18. Because the Court of Appeal determined that reversal of the judgment was required on this ground alone, it did not reach any of defendant's additional claims.

The People sought review of the Court of Appeal decision, contesting both its conclusion that the trial court erred in permitting disclosure of defendant's psychological records and admitting his former therapist's testimony and its further holding that the asserted error violated the federal Constitution and thus was subject to the *Chapman* harmless error standard. We granted review to address these issues.

22

## II. When a parolee is required to participate in psychotherapy as a condition of parole, may the parolee's statements to the psychotherapist during therapy be disclosed in an SVPA proceeding pursuant to Evidence Code section 1012?

In California, as in all other states, statements made by a patient to a psychotherapist during therapy are generally treated as confidential and enjoy the protection of a psychotherapist-patient privilege. Evidence Code section 1014 — the basic provision setting forth California's psychotherapist-patient privilege — provides in relevant part: "Subject to Section 912 [waiver] and except as otherwise provided in this article, the patient . . . has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ." Evidence Code section 1012, in turn, defines " 'confidential communication between patient and psychotherapist' " to mean "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted, and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship."

The statutory provisions embodying the psychotherapist-patient privilege were initially enacted in California in 1965. The Law Revision Commission comment accompanying Evidence Code section 1014 sets forth an overview of the scope and purpose of the psychotherapist-patient privilege as envisioned by its legislative authors. The comment states in part: "This article creates a psychotherapist-patient privilege that provides much broader protection than the

23

physician-patient privilege. [¶] . . . [¶] A broad privilege should apply to both psychiatrists and certified psychologists. Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life. Research on mental or emotional problems requires similar disclosure. Unless a patient or research subject is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment or complete and accurate research depends. [¶] The Law Revision Commission has received several reliable reports that persons in need of treatment sometimes refuse such treatment from psychiatrists because the confidentiality of their communications cannot be assured under existing law. Many of these persons are seriously disturbed and constitute threats to other persons in the community. Accordingly, this article establishes a new privilege that grants to patients of psychiatrists a privilege much broader in scope than the ordinary physician-patient privilege. Although it is recognized that the granting of the privilege may operate in particular cases to withhold relevant information, the interests of society will be better served if psychiatrists are able to assure patients that their confidences will be protected. [¶] . . . [¶] The privilege also applies to psychologists and supersedes the psychologist-patient privilege provided in Section 2904 of the Business and Professions Code. The new privilege is one for psychotherapists generally." (Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid. Code (2004 ed.) foll. § 1014, p. 217.)

Although the Legislature established a broad psychotherapist-patient privilege in section 1014, it at the same time adopted numerous explicit statutory exceptions to the privilege that limit the circumstances in which the privilege is applicable. (See Evid. Code, §§ 1016 [patient-litigant exception], 1017 [psychotherapist appointed by court or Board of Prison Terms (now Board of

24

Parole Hearings) to examine individual], 1018 [crime or tort], 1019 [parties claiming through deceased patient], 1020 [breach of duty arising out of psychotherapist-patient relationship], 1021 [intention of deceased patient concerning writing affecting property interest], 1022 [validity of writing affecting property interest], 1023 [proceeding to determine sanity of criminal defendant], 1024 [patient dangerous to self or others], 1025 [proceeding to establish competence], 1026 [required report open to public inspection].) We shall discuss a number of these statutory exceptions in our analysis of the legal issues presented by this case.

Past cases establish that a person seeking to invoke the psychotherapist-patient privilege has the initial burden of establishing the basic facts to show that the privilege is presumptively applicable — in general, that the person consulted constitutes a "psychotherapist" and that the communication in question constitutes a "confidential communication between patient and psychotherapist," within the meaning of the privilege. (Evid. Code, §§ 1010, 1012.) Once the patient has met that burden, the burden shifts to the party who contends that the privilege is inapplicable because one or more of the statutory exceptions applies. (See, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 551-552.)

In the present case, the undisputed facts establish that McAndrews was a psychotherapist and that the therapy records in question and McAndrews's testimony at trial involved confidential communications between patient and psychotherapist within the meaning of the psychotherapist-patient privilege. Accordingly, the privilege was presumptively applicable and the prosecution bore the burden of establishing that a statutory exception applies.

The People initially argue that when psychotherapy is engaged in by a parolee as a condition of parole, the disclosure of the records of such therapy to the district attorney and evaluating psychologists in an SVPA proceeding falls

within an exception to the psychotherapist-patient privilege because parole-mandated therapy has the dual purpose of assisting the parolee and protecting public safety and such disclosure is reasonably necessary to accomplish the public safety goal of such therapy.  In support of this argument, the People rely on language in Evidence Code section 1012 — the section quoted above defining "confidential communication between patient and psychotherapist" — that refers to "third persons . . . to whom disclosure is reasonably necessary for . . . the accomplishment of the purpose for which the psychotherapist is consulted," and on several Court of Appeal decisions that have referred to this language as creating an exception to the psychotherapist-patient privilege that permits disclosure of confidential communications to third persons to whom disclosure is reasonably necessary to accomplish the purpose for which the psychotherapist is consulted.  (See, e.g., *In re Christopher M.* (2005) 127 Cal.App.4th 684, 696; *In re Pedro M.* (2000) 81 Cal.App.4th 550, 554.)

As we explain, however, the People's argument in this regard, and the Court of Appeal decisions upon which the People rely, rest upon a misinterpretation of the purpose and effect of the relevant portion of Evidence Code section 1012.  The language in question tracks comparable language in Evidence Code section 952, which defines " 'confidential communication between client and lawyer' " for purposes of the lawyer-client privilege,[3] and in Evidence

---

[3]     Evidence Code section 952 provides:  "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the

*(footnote continued on next page)*

Code section 992, which defines " 'confidential communication between patient and physician' " for purposes of the physician-patient privilege.[4]  As in these other provisions, the relevant language of Evidence Code section 1012 is intended to make clear that the privileged nature of confidential communications is not lost when, for example, a therapist discloses such communications to his or her personal secretary or to other office staff or consults with other therapists to aid in the diagnosis and treatment of the patient.  (Accord, *Blue Cross v. Superior Court* (1976) 61 Cal.App.3d 798, 800-802 [explaining purpose of identical language in Evid. Code, § 992].)  This language does not create an exception to the privilege, but rather assures that the communication retains its privileged nature notwithstanding such limited disclosure.  (See also Evid. Code, § 912, subd. (d) ["A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege), 994 (physician-patient privilege), [or] 1014 (psychotherapist-patient privilege) . . . , when disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer,

---

*(footnote continued from previous page)*

purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

[4]     Evidence Code section 992 provides:  "As used in this article, 'confidential communication between patient and physician' means information, including information obtained by an examination of the patient, transmitted between a patient and his physician in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the physician is consulted, and includes a diagnosis made and the advice given by the physician in the course of that relationship."

physician, [or] psychotherapist . . . was consulted, is not a waiver of the privilege"].)[5]

Contrary to the People's contention, nothing in the text, legislative history, or purpose of Evidence Code section 1012 supports the proposition that the language in question was intended to give a third party (such as the district attorney or an evaluating psychologist in an SVPA proceeding) the authority to obtain disclosure of a confidential patient-psychotherapist communication over the patient's objection or without the patient's permission on the theory that such disclosure is necessary to accomplish the purpose for which the therapist has been consulted. Whether or not it would be useful or valuable for a district attorney or an evaluating psychologist to have access to confidential communications made by a parolee in the course of therapy sessions in order to evaluate the individual's

---

[5] The Law Revision Commission comment to Evidence Code section 912, which accompanied the provision's enactment in 1965, explains: "[Section 912] [s]ubdivision (d) is designed to maintain the confidentiality of communications in certain situations where the communications are disclosed to others in the course of accomplishing the purpose for which the lawyer, physician, or psychotherapist was consulted. For example, where a confidential communication from a client is related by his attorney to a physician, appraiser, or other expert in order to obtain that person's assistance so that the attorney will better be able to advise his client, the disclosure is not a waiver of the privilege, even though the disclosure is made with the client's knowledge and consent. Nor would a physician's or psychotherapist's keeping of confidential records necessary to diagnose or treat a patient, such as confidential hospital records, be a waiver of the privilege even though other authorized persons have access to the records. . . . Communications such as these, when made in confidence, should not operate to destroy the privilege, even when they are made with the consent of the client or patient. Here, again, the privilege holder has not evidenced any abandonment of secrecy. Hence, he should be entitled to maintain the confidential nature of his communications to his attorney or physician despite the necessary further disclosure." (Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid. Code, *supra*, foll. § 912, pp. 78-79.)

mental condition or potential danger, the usefulness or value of such information is not a valid basis to interpret section 1012 to eliminate the patient's right to protect against the disclosure of such communications. As a general matter, of course, privileges under the Evidence Code have the effect of shielding otherwise relevant, and in some cases crucial, information from disclosure, based upon a legislative determination that the benefits served by the privilege outweigh the advantages that might be obtained in the absence of the privilege. The Law Revision Commission comments accompanying the initial enactment of the psychotherapist-patient privilege, quoted above, make this point clearly. (Cal. Law Revision Com com., Deering's Ann. Evid. Code, *supra*, foll. § 1014, p. 217 ["Although it is recognized that the granting of the privilege may operate in particular cases to withhold relevant information, the interests of society will be better served if [psychotherapists] are able to assure patients that their confidences will be protected"].)[6]

We emphasize that this conclusion — that the language in Evidence Code section 1012 relied upon by the People cannot properly be interpreted to create an exception to the psychotherapist-patient privilege permitting the district attorney or evaluating psychologists in an SVPA proceeding to obtain access to the details of a parolee/patient's therapy records without the patient's permission or consent — does not mean that when therapy is engaged in as a condition of parole the therapist cannot provide general nonintrusive information to parole authorities

---

[6] We disapprove the Court of Appeal decisions in *In re Christopher M.*, *supra*, 127 Cal.App.4th 684, and *In re Pedro M.*, *supra*, 81 Cal.App.4th 550, insofar as they hold that the language of section 1012 in question creates an exception to the psychotherapist-patient privilege.

29

concerning, for example, the parolee's failure to attend scheduled therapy sessions or to participate in the parole-mandated therapy process.**7**

In *Story*, *supra*, 109 Cal.App.4th 1007, for example, the Court of Appeal, after concluding that the psychotherapist-patient privilege applies to and bars the disclosure of hospital records containing the details of outpatient therapy sessions in which a probationer engaged as a condition of probation (*id.* at pp. 1015-1018), went on to make clear that the therapist was not precluded from disclosing more general information to permit the court "to monitor the defendant's participation and progress in the psychotherapy ordered as a condition of probation" (*id.* at p. 1019). (See also *In re Kristine W.* (2001) 94 Cal.App.4th 521, 528 [where juvenile court ordered dependent child to undergo therapy to ameliorate the effects of abuse or neglect, Court of Appeal concluded that "the psychotherapist-patient privilege protects [the child's] confidential communications and details of the therapy, but does not preclude her therapist from giving circumscribed information to accomplish the information-gathering goal of therapy"]; *In re Pedro M.*, *supra*, 81 Cal.App.4th 550, 554-555 [where a juvenile sex offender was required to participate in therapy in a residential sex offender program, Court of Appeal concluded that therapist was permitted to testify in a subsequent proceeding as to whether the juvenile had cooperated in therapy, but at the same time the appellate

---

**7**     Unlike instances in which a private individual voluntarily and confidentially seeks treatment from a psychotherapist — where the fact that treatment has been sought may itself be considered confidential information (see, e.g., *Smith v. Superior Court* (1981) 118 Cal.App.3d 136, 140-142) — when treatment is entered into pursuant to a condition of parole the parole officer and supervising parole authorities are, of course, aware that treatment is occurring, and thus disclosure of the patient's attendance or nonattendance at scheduled therapy sessions would not involve a breach of confidentiality.

30

court approvingly noted that the trial court "carefully sought to circumscribe [the therapist's] testimony 'so that the details of the therapeutic session [would] not [be] disclosed.'  As a consequence, no testimony was admitted regarding any specific statements appellant had made to [the therapist], any advice given to appellant by [the therapist], or any diagnosis made by [the therapist].  Under the circumstances, . . . we hold that the psychotherapist-patient privilege did not preclude [the therapist] from testifying at the adjudication of the supplemental petition concerning appellant's participation and progress in the court-ordered treatment plan"]; accord, *Reynaud v. Superior Court* (1982) 138 Cal.App.3d 1, 11 [when a patient seeks payment for therapy from Medi-Cal, "certain narrowly circumscribed information" can be communicated to the state to permit payment and audit of public funds].)

Nonetheless, the therapist's authority to provide this limited type of general nonintrusive information to parole officials regarding the parolee's compliance with the parole condition requiring participation in therapy does not mean, as the People contend, that by virtue of the language of Evidence Code section 1012 all records and all details of parole-mandated therapy may be provided to public officials without the parolee's knowledge and consent.[8]

A more recent statutory provision, enacted in 2010, indicates the Legislature's recognition that a requirement that a parolee undergo therapy as a condition of parole does not, in itself, operate to exclude confidential

[8]    Because the trial court in this case granted the prosecution access to all of defendant's therapy records and permitted his therapist to testify to all of defendant's communications during therapy, we have no occasion to consider what limited information concerning a parolee's participation in a parole-mandated treatment plan may be disclosed without the parolee's waiver or consent.  Here, disclosure was not limited in any fashion.

31

communications made during the parole-mandated therapy process from the psychotherapist-patient privilege.  The 2010 legislation in question built upon a statutory provision, Penal Code former section 3005, enacted in 2000 (Stats. 2000, ch. 142, § 5, p. 2062), that required the Department of Corrections and Rehabilitation to ensure that any parolee who was found "to pose a high risk . . . of committing violent sex crimes . . . be placed on an intensive and specialized parole supervision," including a "relapse preventive treatment program[]."  In 2007, Penal Code former section 3005 was amended and renumbered as Penal Code section 3008 (Stats. 2007, ch. 579, § 47, pp. 4851-4852), and in 2010 section 3008 was amended once again as part of the legislation popularly known as Chelsea's law.  (Stats. 2010, ch. 219, §§ 1, 21.)

As amended in 2011, Penal Code section 3008, subdivision (d) provides in part:  "On or after July 21, 2012, the parole conditions of a person released on parole for an offense that requires registration pursuant to Sections 290 to 290.023, inclusive [the sex offender registration provisions], shall include all of the following:  [¶] . . . [¶]  (4) *Waiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising parole officer, pursuant to Section 290.09*."  (Italics added.)  A section of the Sex Offender Treatment Program Certification Requirements, promulgated by the California Sex Offender Management Board (see Pen. Code, § 9000 et seq.), explains the reasoning underlying the recently enacted waiver requirement:  "The effectiveness of the containment model of sex offender management depends upon open and ongoing communication between all professionals responsible for supervising, assessing, evaluating, treating, supporting, and monitoring sex offenders.  The absence of open and ongoing communication between these professionals and other involved persons compromises the purpose of the containment team approach and may jeopardize the safety of the community."

32

(Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements, *supra*, at p. 9.)  As a consequence, the Requirements provide:  "*Prior to accepting an offender into treatment and as a condition of the individual receiving treatment services, the treatment provider shall obtain signed waivers of the psychotherapist-patient privilege. . . .  [¶] . . . [¶]  Treatment providers shall not disclose confidential client information to those for whom waivers have not been obtained.*"  (*Id*. at pp. 9-10, italics added, available online at www.casomb.org/docs/Certification_Standards/Certification-Program.pdf [as of DATE OF OPN FILING].)

This recently enacted legislation and the implementing administrative requirements implicitly recognize (1) that when a parolee participates in outpatient therapy as a condition of parole, the therapy sessions are not *automatically* exempt from the psychotherapist-patient privilege and hence subject to disclosure to parole and related law enforcement authorities, but (2) that the state, in imposing such a parole condition, may require a parolee to waive the psychotherapist-patient privilege with regard to such mandated therapy sessions when such a waiver is considered necessary to the effective functioning of the parole process with regard to the parolee in question.

As explained above (*ante*, p. 9), in the present case the trial court, in granting the district attorney's request for disclosure of the Atkinson Center records pertaining to defendant's outpatient therapy sessions, did not rely upon a consent or waiver theory, and no evidence was presented with regard to whether defendant was advised of and affirmatively consented to a disclosure of statements made during the therapy sessions or, if so, the scope or extent of his consent.**9**

_____

**9**	As noted, at the hearing on the motion to quash, the district attorney stated that he had been informed by Dr. Atkinson and defendant's parole agent, and

*(footnote continued on next page)*

33

Instead, the trial court concluded that disclosure of the therapy records to the district attorney and admission of the therapist's testimony at trial were permissible on the basis of the dangerous patient exception to the psychotherapist-patient privilege embodied in Evidence Code section 1024. We next consider the applicability of that exception.

### III. Was disclosure of defendant's therapy records and admission of his therapist's testimony authorized under the dangerous patient exception to the psychotherapist-patient privilege?

Evidence Code section 1024 — the dangerous patient exception to the psychotherapist-patient privilege — provides in full: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."

The Law Revision Commission Comment accompanying the 1965 enactment of Evidence Code section 1024 explains: "This section provides a

---

*(footnote continued from previous page)*

would make an offer of proof, "that it is standard practice for a parolee to sign a consent form acknowledging that the confidentiality of sex offender treatment is limited and qualified to some degree due to the special relationship between the parolee, the treater, and the parole agent" and therefore that "it is possible that the privilege does not apply based on [defendant's] consent." No evidence on the issue of consent was introduced at the hearing, however, and the trial court did not address that point and instead denied the motion to quash on the basis of the dangerous patient exception to the psychotherapist-patient privilege. The current provisions of section 3008, subdivision (d)(4), requiring that the parole conditions of any person released on parole for an offense requiring sex offender registration include a "[w]aiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising parole officer," were not in effect at the time defendant was placed on parole or engaged in the parole-mandated therapy at issue here.

34

narrower exception to the psychotherapist-patient privilege than the comparable exceptions provided by Section 982 (privilege for confidential marital communications) and Section 1004 (physician-patient privilege). Although this exception might inhibit the relationship between the patient and his psychotherapist to a limited extent, it is essential that appropriate action be taken if the psychotherapist becomes convinced during the course of treatment that the patient is a menace to himself or others and the patient refuses to permit the psychotherapist to make the disclosure necessary to prevent the threatened danger." (Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid Code, *supra*, foll. § 1024, p. 236.)

The People contend that in an SVPA proceeding, whenever a trial court finds that the statutorily mandated psychological evaluations of a defendant demonstrate that there is probable cause to believe that the defendant poses a sufficient danger to qualify as an SVP, the dangerous patient exception of Evidence Code section 1024 authorizes the disclosure of the records and content of all prior psychotherapy sessions undergone by the defendant even when those records are otherwise protected by the psychotherapist-patient privilege. For the reasons discussed hereafter, we disagree with the People's contention.[10]

---

**10**     We note that the People do not rely upon the statutory exception to the psychotherapist-patient privilege established by Evidence Code section 1017. That exception applies when a psychotherapist is appointed by a court or the "Board of Prison Terms" (now Board of Parole Hearings) "to examine" an individual, rather than, as here, to provide counseling and treatment. (*Ibid*.; accord, *In re Jones* (Ohio 2003) 790 N.E.2d 321, 325-328 [finding privilege inapplicable to psychologists appointed by court to examine parent but applicable to psychologist appointed to provide counseling to parent].)

Unlike Evidence Code section 1004, which expressly provides a broad exception to the physician-patient privilege rendering the privilege inapplicable in any proceeding "to commit the patient or otherwise place him . . . under the control of another because of his alleged mental or physical condition," Evidence Code section 1024 does not similarly establish a broad categorical exception making the psychotherapist-patient privilege inapplicable either in civil commitment proceedings generally or in SVPA proceedings in particular. (See Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid. Code, *supra*, foll. § 1014, p. 217 [explaining that whereas "[t]here is an exception in the physician-patient privilege for commitment or guardianship proceedings for the patient[,] . . . Section 1024 provides a considerably narrower exception in the psychotherapist-patient privilege"].) Although other statutory exceptions to the psychotherapist-patient privilege render the privilege inapplicable in some types of proceedings (see Evid. Code, §§ 1023 [psychotherapist-patient privilege inapplicable in a proceeding "initiated at the request of the defendant in a criminal action to determine his sanity"], 1025 [psychotherapist-patient privilege inapplicable "in a proceeding brought by or on behalf of the patient to establish his competence"]), neither section 1024 nor any other provision renders the psychotherapist-patient privilege inapplicable in an SVPA proceeding.[11]

---

[11] Although it was neither cited nor relied upon by either the district attorney or the trial court, the People, in briefing filed in this court, advance in support of their position a provision of the SVPA — Welfare and Institutions Code section 6603, subdivision (c) — that was addressed by this court in *Albertson v. Superior Court* (2001) 25 Cal.4th 796. That statutory provision, however, authorizes only a limited disclosure of therapy records in circumstances that differ from this case.

Welfare and Institutions Code section 6603, subdivision (c)(1) provides in relevant part: "If the attorney petitioning for commitment under [the SVPA] determines that updated evaluations are necessary in order to properly present the case for commitment, the attorney may request the State Department of State

*(footnote continued on next page)*

Although the dangerous patient exception of Evidence Code section 1024 does not automatically render the psychotherapist-patient privilege inapplicable in SVPA proceedings, we emphasize that this does not mean that the dangerous patient exception cannot properly come into play in an SVPA proceeding. As we have seen, Evidence Code section 1024 provides that "[t]here is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." Under section 1024, when a therapist who is

---

*(footnote continued from previous page)*

Hospitals to perform updated evaluations. . . . These updated or replacement evaluations shall include review of available medical and psychological records, including treatment records, consultation with current treating clinicians, and interviews of the person being evaluated, either voluntarily or by court order."

By its terms, Welfare and Institutions Code section 6603, subdivision (c)(1) applies only when updated or replacement evaluations are requested and prepared, which did not occur in this case. Moreover, the provision does not authorize disclosure of therapy records directly to the district attorney, as the trial court ordered here, but rather authorizes review of such records only by the independent evaluators and grants a district attorney access to otherwise confidential treatment information concerning an alleged SVP only "to the extent such information is contained in an updated mental evaluation." (*Albertson v. Superior Court*, *supra*, 25 Cal.4th at p. 807.) Finally, the legislative history of this statutory provision — described in *Albertson*, at pages 805-807 — indicates that the provision was enacted in response to the earlier Court of Appeal opinion in *Albertson*, suggesting that the therapy records that the Legislature contemplated would be reviewed for the updated evaluations are the records of *current* inpatient therapy that is being provided to the defendant while he or she is confined as part of the SVPA procedure. (See *Albertson*, *supra*, at p. 800 [district attorney sought access to "records of petitioner's mental health treatment undertaken after he was moved [to Atascadero State Hospital] pending trial [in the SVPA proceeding]"].) In light of this history, it is not apparent whether the Legislature intended the updated evaluations to include review of the records of all psychotherapy sessions in which a defendant has participated in the past when not subject to such confinement.

37

providing treatment to a patient concludes that the patient is a danger to himself or herself or to others and that disclosure of the contents of a therapy session is necessary to prevent the threatened danger, the therapist is free to testify about those statements in the SVPA proceeding.[12] (See, e.g., *Mavroudis v. Superior Court* (1980) 102 Cal.App.3d 594, 603 ["[Evid. Code, § 1024] apparently was designed to enable the therapist to initiate commitment proceedings and to testify in those proceedings when he determines the patient may present a danger to himself or others"]; accord, *People v. Lakey* (1980) 102 Cal.App.3d 962, 977 [under Evid. Code, § 1024, therapist who treated the defendant during the course of his MDSO commitment at Atascadero State Hospital could properly testify at MDSO recommitment proceeding to statement made by the defendant during treatment inasmuch as "[t]he proceeding below was premised upon the belief of defendant's psychotherapist, and the medical staff at Atascadero State Hospital,

---

[12] Although the language of Evidence Code section 1024 — providing that the dangerous patient exception is applicable "if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another" — is potentially ambiguous regarding whether the statute requires only that the therapist have reasonable cause to believe the patient is dangerous or also requires that the therapist subjectively believe that the patient is dangerous, the Law Revision Commission Comment accompanying this exception, quoted earlier (*ante*, pp. 34-35), indicates that the drafters intended the exception to come into play only when the therapist has reasonable cause to believe and actually believes that the patient is dangerous. ("[I]t is essential that appropriate action be taken if the psychotherapist becomes convinced during the course of treatment that the patient is a menace to himself or others . . . ." (Cal. Law Revision Com. com., reprinted in Deering's Ann. Evid. Code, *supra*, foll. § 1024, p. 236.)) Our past cases have interpreted section 1024 consistently with the drafters' intent in this regard. (See, e.g., *People v. Wharton, supra,* 53 Cal.3d at p. 560 ["Under [Evid. Code, § 1024], if a certain factual predicate exists (i.e., if the therapist believes the patient is a danger to another and disclosure is necessary to prevent the danger), the statute . . . provides that '[t]here is no privilege.' "].)

that defendant constitutes 'a serious threat of substantial harm to the health and safety of others' "]; *In re Kevin F.* (1989) 213 Cal.App.3d 178, 183 [under Evid. Code, § 1024, statements during therapy session were properly admitted in juvenile proceeding where therapist concluded that patient was dangerous and disclosure was necessary to avert future threatened danger upon patient's transfer to a more secure facility]; *People v. One Ruger .22-Caliber Pistol* (2000) 84 Cal.App.4th 310, 315 ["Information obtained on the question of endangerment during [Welf. & Inst. Code] section 5150 treatment and evaluation is admissible [under Evid. Code, § 1024] because it is 'necessary to prevent the threatened danger.' "].)**13**

In the present case, however, we agree with the Court of Appeal's conclusion that the trial court erred in relying on section 1024 in ordering disclosure of the Atkinson Center treatment records, and in permitting McAndrews to testify to the details of defendant's therapy sessions. From the record before us, it appears that the trial court's conclusion that the dangerous patient exception was applicable was based solely on the district attorney's

---

**13** In many other states, the psychotherapist-patient privilege statute contains a similarly limited dangerous patient exception under which the privilege is inapplicable in a civil commitment or hospitalization proceeding only if the therapist has determined in the course of diagnosis or treatment that the patient is in need of commitment or hospitalization. (See, e.g., Ala. Rules Evid., rule 503(d)(1); Alaska Rules Evid., rule 504(d)(4); Ark. Rules Evid., rule 503(d)(1); Del. U. Rules Evid., rule 503(d)(1); Fla. Stat., tit. VII, § 90.503(4)(a); Idaho Rules Evid., rule 503(d)(1); Ky. Rules Evid., rule 507(c)(1); Mass. Gen. Laws, pt. III, ch. 233, § 20B(a); Me. Rules Evid., rule 503(e)(1); Miss. Rules Evid., rule 503(d)(1); Neb. Rev. Stat. § 27-504(4)(a); N.M. Rules Evid., rule 11-504, subd. D. (1); N.D. Rules Evid., rule 503(d)(1); Okla. Stat., tit. 12, §12-2503(D)(1); S.D. Codified Laws § 19-13-9; Utah Rules Evid., rule 506(d)(2); Wis. Stat. § 905.04(4)(a).)

conclusory offer of proof that the Atkinson Center records would show that McAndrews believed defendant did present a danger. As the Court of Appeal explained, however, "[a]lthough the district attorney had the burden to prove the factual predicate for the exception, he presented no evidence that defendant had ever said anything to McAndrews during therapy that led her to believe that he posed a danger to others. Nor did the district attorney present any evidence that McAndrews ever considered it necessary to disclose particular confidential communications in order to prevent defendant from harming someone . . . ." Indeed, as set forth in the statement of facts (*ante*, pp. 12-14), when McAndrews later testified at the SVPA trial she did not indicate that defendant's statements or actions during the therapy sessions led her to believe that he was dangerous or that it was necessary to disclose such statements to prevent any threatened danger. Although in her trial testimony McAndrews did express her concern that defendant's consumption of alcohol in the presence of children constituted a "recipe for a sex offense," that concern was not based upon any information conveyed to her by defendant during therapy and she did not testify that she believed that it was necessary to reveal any confidential communications from therapy to prevent danger to defendant or to others.[14]

---

[14] The case of *People v. Martinez*, *supra*, 88 Cal.App.4th 465, upon which the People heavily rely, is distinguishable from the present case in this respect. Unlike this case, in which there is no evidence that defendant's statements during therapy led his therapist to conclude that he posed a danger to others, the decision in *Martinez* indicates that the therapists who conducted the prior therapy sessions at issue in that matter, which occurred while the defendant was confined at Atascadero State Hospital as an MDSO, had concluded that the defendant suffered from "disorders of atypical paraphelia, aggressive sexual assault, and antipersonality disorder," had not benefitted from treatment as an MDSO, and therefore should be returned to prison. (*Id*. at p. 471.) Thus, the therapists in *Martinez* clearly believed, as a result of their interactions with the defendant

*(footnote continued on next page)*

We note also that the district attorney made no effort to demonstrate why the dangerous patient exception would justify the disclosure of *all* the presumptively privileged Atkinson Center therapy records, rather than simply those particular communications whose disclosure was necessary to prevent the threatened danger. Past decisions of this court make it clear that even when some of a patient's statements in therapy are subject to disclosure under Evidence Code section 1024, the rest of the patient's confidential communications remain privileged. (See, e.g., *People v. Wharton, supra,* 53 Cal.3d at p. 554 ["the mere fact that some statements are nonprivileged by operation of section 1024 does not automatically make all of defendant's confidential communications to his therapists available to the prosecution"]; see also *Menendez v. Superior Court* (1992) 3 Cal.4th 435, 455-456; *San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1091 ["The 'dangerous patient' exception to the privilege is narrow in the sense it only permits disclosure of those communications which triggered the psychotherapist's conclusion that disclosure of a communication was needed to prevent harm"].) Accordingly, the trial court erred in ruling that under section 1024 the confidential Atkinson Center therapy records could properly be disclosed to the district attorney and evaluating psychologists, and in permitting

_____

*(footnote continued from previous page)*

during therapy, that the defendant continued to pose a danger to others, and the prior psychological records that were disclosed and utilized in the SVPA proceeding in *Martinez* reflected that belief. Accordingly, the disclosure was permissible under Evidence Code section 1024. (See, e.g., *People v. Wharton, supra*, 53 Cal.3d at p. 558 ["Because defendant made comments within the psychotherapeutic relationship which led his therapists to reasonably conclude he posed a threat . . . , such comments were not privileged pursuant to section 1024"].)

41

McAndrews to testify about all of defendant's confidential communications made during their numerous therapy sessions.

For the foregoing reasons, we conclude that the trial court erred in permitting disclosure and admission at trial of defendant's confidential communications during the therapy sessions.

We turn to the question whether the trial court's error in this regard requires a reversal of the trial court judgment.

### IV. Was the trial court error in ordering disclosure of defendant's therapy records and admitting the testimony of defendant's therapist prejudicial?

In analyzing the issue of prejudice, we first address the question of what prejudicial error standard applies in this setting. In its initially filed opinion, the Court of Appeal applied the prejudicial error standard applicable to state law error set forth in *People v. Watson*, *supra*, 46 Cal.2d 818 — which calls for reversal only if it is reasonably probable that the result would have been different in the absence of such error — and found the error nonprejudicial under that standard. Thereafter, however, the Court of Appeal granted rehearing and ultimately concluded that the applicable standard is the prejudicial error standard for federal constitutional error set forth in *Chapman v. California*, *supra*, 386 U.S. 18 — which requires reversal unless the appellate court concludes that the error was harmless beyond a reasonable doubt —and further concluded that the error was prejudicial under that standard. The People contend that the Court of Appeal erred in applying the prejudicial error standard applicable to federal constitutional error.

For the reasons discussed hereafter, we conclude that the Court of Appeal erred in this regard.

### A. Does the federal constitutional prejudicial error standard apply in this context?

In concluding that the federal constitutional prejudicial error standard applies in this setting, the Court of Appeal relied on language from this court's decision in *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432, and similar statements in a number of other federal and state court decisions, indicating that there is a federal constitutional right of privacy that affords some measure of protection to confidential psychotherapist-patient communications.[15]  Although over 40 years have elapsed since our decision in *Lifschutz,* the United States Supreme Court itself has not yet definitively determined whether the federal Constitution embodies even a *general* right of informational privacy.  (See *Whalen v. Roe* (1976) 429 U.S. 589, 605 [assuming, but not deciding, that such a right exists]; *NASA v. Nelson* (2011) ___ U.S. ___ [178 L.Ed.2d 667, 673] [same].)  In *Jaffee v. Redmond* (1996) 518 U.S. 1, the United States Supreme Court adopted a psychotherapist-patient privilege applicable in federal proceedings, but the *Jaffee*

---

[15]    In *In re Lifschutz, supra*, 2 Cal.3d at pages 431-432, the court stated: "[W]e are . . . mindful of the justifiable expectations of confidentiality that most individuals seeking psychotherapeutic treatment harbor. . . .  [¶]  We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California statute and draws sustenance from our constitutional heritage.  In *Griswold v. Connecticut* [(1965)] 381 U.S. 479, 484, the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone."  (See also *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 930, fn. 11; *Caesar v. Mountanos* (9th Cir. 1976) 542 F.2d 1064, 1067-1068; *State v. Russo* (Conn. 2002) 790 A.2d 1132, 1147-1150; *McMaster v. Iowa Bd. of Psychology Examiners* (Iowa 1993) 509 N.W.2d 754, 758-759; *Alpha Medical Clinic v. Anderson* (Kan. 2006) 128 P.3d 364, 376.)

decision was grounded in the Federal Rules of Evidence,[16] not the federal Constitution, and subsequent lower court decisions confirm that the federal psychotherapist-patient privilege recognized in *Jaffee* "is not rooted in any constitutional right of privacy." (*United States v. Glass* (10th Cir. 1998) 133 F.3d 1356, 1358; see also *United States v. Chase* (9th Cir. 2003) 340 F.3d 978, 993 ["a violation of the psychotherapist-patient privilege is not a constitutional error"]; *United States v. Squillacote* (4th Cir. 2000) 221 F.3d 542, 560 [the psychotherapist-patient privilege recognized in *Jaffee* "is a testimonial or evidentiary one, and not constitutionally based"].)

Nonetheless, for purposes of resolving the issue in this case, we conclude that it is appropriate to follow the lead of the high court in *Whalen v. Roe, supra*, 429 U.S. 589 and *NASA v. Nelson, supra*, ___ U.S. ___ [178 L.Ed.2d 667], and to assume, *without deciding*, that in at least some circumstances the federal Constitution protects an individual from governmentally compelled disclosure of confidential communications between the individual and his or her psychotherapist or the use of information obtained by such compelled disclosure in a court proceeding. Assuming (without deciding) the federal Constitution provides such protection in some circumstances, however, it does not follow that every violation of a state-created psychotherapist-patient privilege constitutes a

---

**16**     At the time of *Jaffee*, rule 501 of the Federal Rules of Evidence (28 U.S.C.) provided in relevant part: "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the United States Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

violation of the federal Constitution or that the error in this case constitutes such a federal constitutional violation.

To begin with, it is clear that, for federal constitutional purposes, the relevant question is not whether the disclosure in this case violated the terms of California's current statutory provisions regarding the psychotherapist-patient privilege. The governing United States Supreme Court decisions establish that " 'a "mere error of state law" is not a denial of due process.' " (*Swarthout v. Cooke* (2011) 562 U.S. ___, ___ [178 L.Ed.2d 732, 737]; see also, e.g., *Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21 ["If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.' "]; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 195; *People v. Rundle* (2008) 43 Cal.4th 76, 136.) We recognize that in *Hicks v. Oklahoma* (1980) 447 U.S. 343, the high court held that when state law creates a liberty interest in having a jury make a particular factual finding that is necessary for criminal punishment, the denial of a jury trial with respect to such a finding constitutes a violation of the federal due process clause. (*Id.* at p. 346.) Subsequent high court cases explain, however, that *Hicks* is limited to the jury trial context and holds "only that where state law creates for the defendant a liberty interest in having the jury make particular findings, the Due Process Clause implies that appellate findings do not suffice to protect that entitlement." (*Cabana v. Bullock* (1986) 474 U.S. 376, 387, fn. 4.) California's psychotherapist-patient privilege does not implicate the right to jury trial and thus the decision in *Hicks* has no application here. Accordingly, the fact that the trial court's rulings violated the state statutory psychotherapist-patient privilege does not demonstrate that the error violates the federal Constitution.

In finding a federal constitutional violation in its decision below, the Court of Appeal relied heavily on the fact that the current statutory exceptions to

45

California's psychotherapist-patient privilege were inapplicable under the circumstances of this case.[17]  Instead of relying upon the contours of the existing state statutory provisions and the specific state interest reflected in those particular statutory provisions, however, we believe that in order to properly distinguish the federal constitutional issue from the state law issue, it is necessary, in determining whether the disclosure of defendant's therapy records and the admission of his therapist's testimony violated a federal constitutional right of privacy, to look to the specific nature and extent of the federal constitutional privacy interests that are actually implicated in this particular setting and to the permissible state law interests that would support the disclosure and admission of testimony in question in such a setting.  The United States Supreme Court undertook a similar approach in *Whalen v. Roe*, *supra*, 429 U.S. 589, and *NASA v. Nelson*, *supra*, ___ U.S. ___ [178 L.Ed.2d 667], assessing the justification for the challenged governmental action at issue in those cases against a realistic view of the intrusion upon privacy that the governmental action actually entailed.  (*Whalen, supra,* 429 U.S. at pp. 598-604; *Nasa, supra,* ___ U.S. at ___ [178 L.Ed.2d at pp. 679-686].)[18]

---

[17]      The Court of Appeal stated in this regard:  "[A]t an SVP trial, when the dangerous-patient exception applies, it can be said that the state's interest in public safety and the ascertainment of truth outweigh the inmate's statutory interest in confidentiality and justify the interference with his or her constitutional right of privacy.  However, where the dangerous-patient exception does *not* apply, the state's interest in public safety and the ascertainment of truth do not clearly or necessarily outweigh an inmate/patient's privacy interests. . . .  And if the state's interests are not strong enough to outweigh the statutory protection of privacy, we do not consider those interests to be sufficiently compelling to outweigh the constitutional protection."

[18]      In this case, unlike *Whalen v. Roe*, *supra*, 429 U.S. 589, and *NASA v. Nelson*, *supra*, ___ U.S. ___ [178 L.Ed.2d 667], the challenged disclosure was not authorized by the governing state law.   Nonetheless, in order to determine whether the disclosure violated the federal Constitution (and not simply current

*(footnote continued on next page)*

46

Here, the privacy interest at issue was that of a parolee, and the therapy sessions were engaged in by the parolee as a condition of parole and were conducted by a therapist chosen and paid for by the state. In evaluating the potential intrusion upon a federal constitutional right of privacy that is present under these circumstances, we must keep in mind the numerous cases that recognize that the federal Constitution grants states considerable leeway to impose very substantial limitations on the right of privacy retained by persons who are released on parole — much greater limitations than those the state may impose on persons who are not on parole. In *Samson v. California* (2006) 547 U.S. 843, for example, the federal high court noted that it had repeatedly found "that a State's interest in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment" (*id.* at p. 853), and held that the federal Constitution did not preclude a state from adopting a general policy authorizing a parole officer or any law enforcement officer to search a parolee at any time or place even in the absence of a reasonable suspicion that the parolee had violated parole (*Samson*, *supra*, at pp. 854-855). In the course of its decision, the court in *Samson* noted the many limitations upon a parolee's privacy that are authorized under California law, "including *psychiatric treatment programs*, mandatory abstinence from alcohol, residence approval, and '[a]ny other conditions deemed necessary by the Board [of Parole Hearings] or the

---

*(footnote continued from previous page)*

state law), we must consider whether or not there is a sufficient constitutionally permissible state interest to justify the actual intrusion upon a federally protected privacy interest of defendant that is actually implicated under the circumstances of this case.

47

Department [of Corrections and Rehabilitation] due to unusual circumstances' "
and concluded that "[t]he extent and reach of these conditions clearly demonstrate
that parolees like petitioner have severely diminished expectations of privacy by
virtue of their status alone." (*Id.* at p. 852, italics added.) In light of the very
limited scope under the governing federal authorities of the federal constitutional
right of privacy possessed by a parolee, the intrusion upon defendant's federal
constitutional right of privacy was considerably less than if the disclosure
implicated therapy sessions of a nonparolee.

At the same time, the state has a particularly strong and legitimate interest
in authorizing the disclosure and use of a parolee's prior statements that occur in
parole-mandated therapy in a subsequent SVPA proceeding, especially when, as
here, the parole-mandated therapy was occasioned by the parolee's prior
conviction of a sex offense. The central issue in an SVPA proceeding, of course,
concerns the defendant's current mental condition and whether he or she poses a
potential danger to others in light of that mental condition. The state clearly has a
substantial interest in permitting all potentially relevant information relating to the
defendant's current mental state to be considered in such a proceeding, so that an
accurate assessment of the potential danger posed by the defendant can be
determined.[19] Accordingly, from a federal constitutional standpoint, it cannot be

---

[19] We note that although California has chosen not to adopt a broad statutory
exception to the psychotherapist-patient privilege that renders the privilege
completely inapplicable in any civil commitment or SVPA proceeding, the
psychotherapist-patient privilege statutes of a number of other states provide that
the privilege is inapplicable in civil commitment proceedings. (See, e.g., Hawaii
Rules Evid., rule 504.1(d)(1); Md. Cts. & Jud. Proceedings Code Ann., § 9-
109(d)(1); N.J. Stat. Ann., § 45:14B-28; Tex. Evid. Rules, rule 509(e)(6); Va.
Code, § 8.01-400.2; Vt. Rules Evid., rule 503(d)(1).)

said that disclosure and use in an SVPA proceeding of a parolee's prior statements in parole-mandated therapy is not supported by a legitimate and substantial state interest.

Taking into account the limited intrusion upon defendant's federal constitutional right of privacy and the substantial state interest that supports the disclosure and use of evidence relating to defendant's mental state in an SVPA proceeding, we conclude that disclosure and use of defendant's statements in this case did not violate defendant's federal constitutional right of privacy. (Accord, *Seaton v. Mayberg* (9th Cir. 2010) 610 F.3d 530, 535-541 [finding no federal constitutional violation in the use, in an SVPA proceeding, of psychological records of a person civilly confined for SVPA evaluation].)[20]

Accordingly, we conclude that the error that occurred in this SVPA proceeding by virtue of the disclosure of defendant's therapy records and the admission of his therapist's testimony constituted only state law error, and did not rise to the level of federal constitutional error. It follows that the applicable

---

[20] We note that this case does not present the question whether either the federal constitutional right of privacy or the federal due process clause would bar the state's use of a parolee's communications to his or her psychotherapist if the state deliberately misled the parolee to believe that the communications would be confidential but then used the communications in an SVPA proceeding notwithstanding its prior representation of confidentiality. Here, there is no suggestion that defendant's parole officer, treating therapist, or any state official intentionally misled defendant or that defendant subjectively believed that information he revealed to his therapist would not be revealed to his parole officer or other public officials. On the contrary, during defendant's testimony at trial, when asked why he did not tell his therapist that he had been drinking beer, defendant responded: "Because she would call my parole officer and they would come and put me back in jail."

49

prejudicial error standard is the state law prejudicial error standard set forth in *People v. Watson*, *supra*, 46 Cal.2d 818.

### B. Was reversal required under the *Watson* standard?

As explained above, under the prejudicial error standard set forth in *People v. Watson*, *supra*, 46 Cal.2d 818, 836, we must determine whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. As already noted, in its initial opinion prior to its grant of rehearing, the Court of Appeal applied the *Watson* prejudicial error standard and found that under that standard the trial court error did not require reversal of the trial court judgment. As we explain, we agree with that conclusion.

In evaluating the question of prejudice, we first set forth the elements that the prosecution was required to prove in this proceeding and thereafter review the evidence, absent the disputed records and therapist's testimony, which was before the jury. We then consider whether or not it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error.

As the trial court explained to the jury immediately prior to deliberations, in order to prove that defendant is an SVP, the People were required to prove beyond a reasonable doubt that (1) defendant has been convicted of at least one sexually violent offense, (2) he has a diagnosed mental disorder, (3) as a result of that mental disorder he will be a danger to the health and safety of others because it is likely he will engage in sexually violent criminal behavior, and (4) it is necessary to keep him in custody in a secure facility to ensure the health and safety of others. Furthermore, because on May 17, 2004, at the prior SVPA proceeding, defendant was found not to be a danger to commit a future sexual violent crime, the trial court explained that the People were also required to prove beyond a reasonable doubt that there were "materially changed circumstances" that occurred since that

50

date "that now make defendant a likely danger to commit a sexually violent offense."

Much of the prosecution's case did not involve the evidence that related to the trial court error in question here — namely, the information from defendant's therapy records and his therapist's testimony regarding defendant's statements during the therapy sessions. The two prosecution psychologists who testified at trial initially interviewed defendant and administered their own evaluative tests without any knowledge of the content of the therapy sessions in question, and their independent conclusions that defendant suffered from pedophilia, a mental disorder that rendered him a danger to the health and safety of others, were largely based on their personal interviews and testing of defendant, not on the disputed evidence. Although both psychologists testified that defendant's statement to the therapist that he had molested 16 children confirmed their conclusions, neither appeared to give that isolated statement much weight and instead, in considering defendant's past conduct, relied primarily on the three prior incidents that had resulted in criminal convictions. In addition, the psychologists' conclusions that defendant's parole violations that occurred after the prior SVPA proceeding — involving repeated instances in which defendant, although aware of his parole conditions, failed to comply with the prohibition on consuming alcohol and being in his mother's home when children were present — demonstrated a deterioration in defendant's ability to control his conduct and constituted materially changed circumstances, which increased the likelihood that he would commit a sexually violent offense, were not based upon the disputed evidence at all.

Similarly, the testimony of defendant's parole officer, relating the details of defendant's parole violations, did not involve the disputed evidence. Finally, defendant's own statement on the witness stand that it was not all right for him to

drink beer while on parole "because it would give me visions of little kids" was independent of any evidence relating to his therapy sessions while on parole.

The jury also had before it additional evidence unrelated to the trial court error that was presented during the defense case. The testimony of defendant's mother regarding his illness, limited abilities, and his conduct during visits to her house while on parole (including her testimony that she could not stop him from drinking beer at her house because "he won't mind me even if I tell him") was unrelated to the disputed evidence. In addition, the testimony of defendant's sister, including her acknowledgement on cross-examination that she made a point of keeping an eye on her children when defendant was visiting because of defendant's prior conduct that had led to his imprisonment, was independent of any evidence concerning defendant's therapy sessions.

At the same time, the jury also had before it the testimony of a defense investigator regarding the size and nature of the public park at which defendant had stopped that could have minimized the seriousness of that conduct, the testimony of the service coordinator at the San Andreas Regional Center regarding the services and supervision that would be available to defendant because of his developmental disability were he not committed as a sexually violent predator, and, finally, the testimony of the two defense psychologists who disagreed with the prosecution psychologists' diagnosis of defendant as suffering from pedophilia and concluded instead that defendant's past offenses were better explained as resulting from his developmental disability. All of this evidence, as well, was independent of the disputed evidence.

Considering the elements that the People were required to prove, and taking into account all of the evidence before the jury, we conclude for a number of reasons that it is not reasonably probable that the jury would have reached a different verdict in the absence of the trial court error. First, although the

52

improperly admitted evidence unquestionably included a number of potentially damaging statements made by defendant during therapy — in particular, defendant's admission regarding 16 molestation victims and his acknowledgment to his therapist that he was "very attracted" to small children and especially when drinking "would have an overwhelming desire to touch them" — the reliability of defendant's isolated reference to 16 victims was significantly weakened by the circumstances in which that statement was made and that statement did not overshadow the undisputed fact that defendant had been convicted of three widely-spaced sex offenses against three different young girls, and defendant's continued attraction to young children when drinking was reflected not only in his statement to his therapist during therapy but also in defendant's testimony at trial that he should not drink beer because it gave him "visions of little kids." Second, the determination of the evaluating psychologists — who had interviewed and tested defendant independently — that defendant suffered from pedophilia and posed a significant danger if not confined and treated was quite strong and did not depend upon the therapy records from the Atkinson Center or the treating therapist's testimony. Third, defendant's repeated parole violations for drinking beer and his admission that he had knowingly been present at his mother's house when children were present, combined with his testimony at trial regarding his visions of small children when drinking beer, provided significant support for the evaluating psychologists' conclusion that, absent confinement and treatment, defendant posed a continuing danger to children. Fourth, in his closing argument, the district attorney did not emphasize the evidence affected by the trial court error but instead drew the jury's attention to defendant's testimony at trial in which he stated that it was not all right for him to drink beer while on parole "because it would give me visions of little kids," as well as to defendant's sister's testimony that when defendant was at their mother's house while her children were there, she

53

always kept a close eye on her children because of defendant's past conduct. Finally, the jury's request during deliberations for a rereading of the testimony of defendant and defendant's sister suggests that the testimony of these witnesses — rather than evidence related to the contents of defendant's therapy sessions — held particular significance for the jury. Under these circumstances, we conclude that the trial court error was not prejudicial under the *Watson* standard.

## V. Conclusions and Disposition

For the reasons discussed above, we agree with the Court of Appeal's conclusion that the trial court erred in determining that disclosure of defendant's therapy records and admission of the testimony of defendant's therapist were authorized by the dangerous patient exception to the psychotherapist-patient privilege. We disagree, however, with the Court of Appeal's conclusion that the trial court error constituted federal constitutional error rather than state law error, and accordingly we conclude that the prejudicial nature of the error must be evaluated under the *Watson* standard. Applying that standard, we conclude that the trial court error at issue was not prejudicial.

Accordingly, the Court of Appeal judgment, reversing the trial court judgment, is reversed. We remand this matter to the Court of Appeal for consideration and resolution of the additional claims of error raised by defendant on appeal. (See, *ante*, pp. 21-22.)

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gonzales

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 192 Cal.App.4th 152
**Rehearing Granted**

_____

**Opinion No.** S191240
**Date Filed:** March 18, 2013

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Alfonso Fernandez

_____

**Counsel:**

Jean Matulis, under appointment by the Supreme Court, for Defendant and Appellant.

Ron Boyer for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Gregg Zwyicke, Seth K. Schalit and Bridgit Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jean Matulis
P.O. Box 1237
Cambria, CA 93428
(805) 927-1990

Bridgit Billeter
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-1340