Filed 3/27/15  P. v. Gonzales CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARK ANTHONY GONZALES,<br><br>    Defendant and Appellant. | H040709<br>(Santa Clara County<br>Super. Ct. No. C1349789) |

Defendant Mark Anthony Gonzales pleaded no contest to committing a lewd act on a child under the age of 14 years.  (Pen. Code, § 288, subd. (a).)[1]  The trial court granted a three-year term of probation that included a one-year term in county jail as a condition of probation.  Among other conditions of probation, the court ordered defendant to complete a sex offender management program as mandated by Penal Code section 1203.067 (section 1203.067).  The court also imposed two probation conditions requiring defendant:  (1) to waive any privilege against self-incrimination and participate in polygraph examinations as part of the sex offender management program under section 1203.067(b)(3); and (2) to waive any psychotherapist/patient privilege to enable communication between the sex offender management professional and the probation officer under section 1203.067(b)(4).

---

[1] Subsequent undesignated statutory references are to the Penal Code.

On appeal, defendant challenges the condition requiring waiver of his privilege against self-incrimination as overbroad and in violation of his rights under the Fifth Amendment. He challenges the condition requiring waiver of the psychotherapist-patient privilege as a violation of his statutory right to the privilege and his constitutional right to privacy.

First, we hold that the condition requiring a waiver of the privilege against self-incrimination is prohibited by the Fifth Amendment under *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*). We will strike the relevant waiver language from this condition. Second, we construe the waiver of the psychotherapist-patient privilege as requiring waiver only insofar as necessary to enable communication between the probation officer and the psychotherapist. As so construed, we hold that the waiver of the psychotherapist-patient privilege is not overbroad in violation of defendant's constitutional right to privacy. We will affirm the judgment as modified.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

In 2012, defendant was a 21-year-old sandwich maker working at a supermarket. Mariah Doe, the victim, was a 12-year-old girl at the time. On October 29, 2012, Doe told the police she had had sexual intercourse with defendant earlier that year.

Doe described the incident as follows. She was at a friend's house when defendant picked her up and drove her to his residence. They watched television until 1 a.m., at which time defendant said he wanted to go to sleep. He took Doe into his bedroom and they lay down on the bed. After groping Doe and removing her clothes, defendant had sexual intercourse with her. At around 3 a.m., defendant drove Doe back to her friend's residence.

After Doe told the police about the encounter, police arranged a pretext phone call between her and defendant. During the call, defendant admitted having sexual

_____

[2] The statement of facts is based on a police report as summarized in the probation report.

2

intercourse with Doe. Police arrested him on February 15, 2013, and he voluntarily gave a statement to police. He again admitted having intercourse with Doe but stated that he believed she was 15 or 16 years old.

The prosecution charged defendant by felony complaint with committing a lewd act on a child under the age of 14 years. (§ 288, subd. (a).) Defendant pleaded no contest. The trial court granted a three-year term of probation that included a one-year term in county jail as a condition of probation. The court also ordered defendant to complete a sex offender management program as mandated by section 1203.067.

The court then ordered the probation conditions at issue here: "The defendant shall waive any privilege against self-incrimination and participate in polygraph examinations which will be part of the sex-offender management program, pursuant [to] section 1203.067(b)(3) of the Penal Code. [¶] The defendant shall waive any psychotherapist/patient privilege to enable communication between the sex-offender management professionals and the probation officer." Defendant objected to both conditions on the same grounds he raises here, but the court imposed the conditions over his objections.

## II. DISCUSSION

Defendant challenges the constitutionality of the two waivers required under section 1203.067. He contends the condition requiring waiver of any privilege against self-incrimination under section 1203.067(b)(3) violates the Fifth Amendment and is overbroad. Second, he contends the condition requiring waiver of any psychotherapist-patient privilege under section 1203.067(b)(4) violates his constitutional right to privacy. The Attorney General argues that both waiver conditions are constitutional as worded.

1. *Statutory Scheme*

Under section 1203.067(b)(2), any person placed on formal probation on or after July 1, 2012, for any offense requiring registration under Penal Code sections 290 through 290.023, "shall successfully complete a sex offender management program,

3

following the standards developed pursuant to Penal Code section 9003, as a condition of release from probation." Section 1203.067(b)(3) requires "Waiver of any privilege against self-incrimination and participation in polygraph examinations, which shall be part of the sex offender management program." Section 1203.067 (b)(4) requires "Waiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."[3]

The Legislature enacted these provisions in 2010 to amend the Sex Offender Punishment, Control, and Containment Act of 2006 (hereafter, the "Containment Act"). (Stats. 2010, ch. 219, § 17.) The Containment Act created "a standardized, statewide system to identify, assess, monitor and contain known sex offenders for the purpose of reducing the risk of recidivism posed by these offenders, thereby protecting victims and potential victims from future harm." (Pen. Code, § 290.03, subd. (b), Stats. 2006, ch. 337, § 12.) The Containment Act now requires participation in an "approved sex offender management program" certified by the California Sex Offender Management Board (CASOMB). (Pen. Code, § 9003.)

Under Penal Code section 9003, CASOMB promulgates standards for certification of sex offender management programs and "sex offender management professionals." (Pen. Code, § 9003, subds. (a) & (b).) Such programs "shall include treatment, as specified, and dynamic and future violence risk assessments pursuant to Section 290.09." (Pen. Code, § 9003, subd. (b).) Furthermore, sex offender management programs "shall include polygraph examinations by a certified polygraph examiner, which shall be conducted as needed during the period that the offender is in the sex offender management program." (*Ibid.*)

---

[3] These same two waiver conditions apply to parolees. (Pen. Code, § 3008, subds. (d)(3) & (d)(4).)

4

Penal Code section 290.09 specifies that "[t]he certified sex offender management professional shall communicate with the offender's probation officer or parole agent on a regular basis, but at least once a month, about the offender's progress in the program and dynamic risk assessment issues, and shall share pertinent information with the certified polygraph examiner as required." (Pen. Code, § 290.09, subd. (c).) Penal Code section 290.09 further requires the sex offender management professional to administer a State-Authorized Risk Assessment Tool for Sex Offenders (SARATSO) in two forms—the "SARATSO dynamic tool" and the "SARATSO future violence tool"—and to send the person's scores on these tests to the probation officer. (Pen. Code, § 290.09, subd. (b)(2).) The probation officer must then transmit the scores to the Department of Justice, which makes the scores accessible to law enforcement officials through the Department's website. (*Ibid.*)

2. *Waiver of Any Privilege Against Self-Incrimination*

By requiring the waiver of "any privilege against self-incrimination," the plain language of section 1203.067(b)(3) squarely implicates defendant's rights under the Self-Incrimination Clause of the Fifth Amendment. The "core" right of the Self-Incrimination Clause protects against the use of compelled statements "*in a criminal proceeding* against the person who gave them." (*Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1128 (*Maldonado*) [citing *Chavez v. Martinez* (2003) 538 U.S. 760, 766-773 (plur. opn. of Thomas, J.) (*Chavez*)], original italics.) Because the statute requires a waiver of *any* privilege against self-incrimination, the probation condition necessarily includes a waiver of the "core" right under the Self-Incrimination Clause. The plain language of the waiver, if left intact, would therefore allow the state to use defendant's compelled statements against him in a separate criminal proceeding.

The Attorney General contends that the Fifth Amendment only prohibits the use of defendant's compelled statements against him in a separate criminal proceeding, implying the claim is not ripe. She argues that no violation of the Fifth Amendment will

occur because defendant's compelled statements will never be used against him. But the Attorney General does not explain how defendant could protect his Fifth Amendment rights in a future criminal proceeding after expressly waiving these rights as a condition of probation. As noted by Justice Thomas' plurality opinion in *Chavez*: "Once an immunity waiver is signed, the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled. A waiver of immunity is therefore a prospective waiver of the core self-incrimination right in any subsequent criminal proceeding . . . ." (*Chavez*, *supra*, 538 U.S. at p. 768, fn. 2 (plur. opn. of Thomas, J.).)

Thus, a state-compelled, prospective waiver of the privilege against self-incrimination gives rise to a Fifth Amendment claim *before* a declarant's incriminating statements are used in a criminal prosecution, regardless of whether the state ever initiates such a prosecution. The Supreme Court's longstanding "penalty cases" jurisprudence established this rule decades ago. (*Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation* (1968) 392 U.S. 280, 283 [Fifth Amendment violated when state fired public employees for invoking and refusing to waive the privilege against self-incrimination]; *Gardner v. Broderick* (1968) 392 U.S. 273, 276 [Fifth Amendment prohibits state from firing policeman for refusing to waive the privilege against self-incrimination].)

In *Lefkowitz v. Turley* (1973) 414 U.S. 70, licensed architects challenged a New York statute disqualifying contractors for public contracts if they refused to waive their Fifth Amendment immunity. The architects, when called as witnesses before a grand jury, refused to sign waivers of immunity. The state had not charged them with any crimes, nor used their statements against them in any criminal proceeding. Nonetheless, the Supreme Court held that the statutorily compelled waivers violated the Self-Incrimination Clause. The Supreme Court again reaffirmed this principle in *Lefkowitz v. Cunningham* (1977) 431 U.S. 801. There, a New York statute provided that if a political

6

party officer was subpoenaed to testify about the conduct of his office but the officer refused to testify or waive immunity, the officer was barred from holding office for five years. Cunningham, when subpoenaed to testify before a grand jury, refused to sign a waiver of immunity, and he was barred from holding office. The state never threatened or attempted to use Cunningham's statements against him in a criminal prosecution, yet the Supreme Court struck down the statute as a violation of the Self-Incrimination Clause. These cases make clear that a state-compelled, prospective waiver of immunity violates the Self-Incrimination Clause apart from the use of any such compelled statements in any subsequent criminal proceeding.

The Attorney General relies on *Maldonado* for the proposition that the Fifth Amendment is not violated until a defendant's statements are used against him in a criminal proceeding. But this reliance on *Maldonado* ignores the analytical distinction between a violation of the "core" Fifth Amendment right and a violation of the "prophylactic" protection prohibiting a compelled waiver of immunity as explained in *Maldonado* itself and in *Chavez*.

In *Maldonado,* the California Supreme Court stated that "a '*core*' Fifth Amendment violation is completed, not merely by official extraction of self-incriminatory answers from one *who has not waived the privilege*, but only if and when those answers are *used in a criminal proceeding* against the person who gave them." (*Maldonado*, *supra*, 53 Cal.4th at p. 1128.) (First italics added.) For this principle, the court relied on the plurality opinion in *Chavez*, *supra*, 538 U.S. at pp. 766-773 (plur. opn. of Thomas, J.).

In *Chavez*, the United States Supreme Court considered a civil rights lawsuit under 42 U.S.C. section 1983 by a plaintiff alleging a violation of the Fifth Amendment. Although the plaintiff's statements were compelled, they were never used against him in a criminal prosecution. (*Chavez*, *supra*, 538 U.S. at pp. 763-764.) Justice Thomas, writing for a plurality of justices, characterized the "core" Fifth Amendment privilege as

7

the right not to be a "witness" against oneself in a "criminal case." (*Chavez*, at pp. 768-769 (plur. opn. of Thomas, J.).) But a majority of justices also affirmed longstanding "prophylactic" or "complementary" protections under the Fifth Amendment that arise prior to and apart from a criminal proceeding. (*Id.* at p. 770 (plur. opn. of Thomas, J.); *id.* at pp. 777-778 (conc. opn. of Souter, J.).) The rule prohibiting a compelled waiver of immunity is one such protection, and is necessary to protect the "core" right against the use of compelled statements in a prosecution. "By allowing a witness to insist on an immunity agreement *before* being compelled to give incriminating testimony in a noncriminal case, the privilege preserves the core Fifth Amendment right from invasion by the use of that compelled testimony in a subsequent criminal case." (*Id.* at p. 771 (plur. opn. of Thomas, J.).)

The California Supreme Court in *Maldonado* did not hold otherwise. There, the court considered a discovery rule requiring a defendant who proffered a mental incapacitation defense to submit to examination by the prosecution's mental health experts. (§ 1054.3, subd. (b)(1).) The court had no occasion to consider a compelled waiver. To the contrary, the court explicitly based its analysis on the uncontroversial premise that the defendant maintained his Fifth Amendment immunity unless and until he voluntarily waived it by introducing his own statements into evidence at trial: "[T]he parties agree that the Fifth Amendment protects petitioner against any direct or derivative use of his statements to the prosecution examiners, except to rebut any mental-state evidence he presents through his own experts." (*Maldonado*, *supra*, 53 Cal.4th at p. 1129, fn. omitted.) "If he decides to abandon the defense, any self-incriminating results of the examinations cannot be introduced or otherwise used against him." (*Id.* at p. 1132.)

Nothing in *Maldonado* authorizes a compelled waiver of immunity. To the contrary, the California Supreme Court explicitly recognized the *Chavez* plurality's affirmation of the so-called "prophylactic rules" under the Fifth Amendment: "The rule

8

allowing a witness to assert the privilege prior to testifying, and to refuse to testify unless granted immunity, Justice Thomas indicated, protects the 'core' Fifth Amendment privilege simply *by assuring that the witness has not forfeited the right against self-incriminating use of his or her testimony in later criminal proceedings.*" (*Maldonado*, *supra*, at pp. 1128-1129, italics added.) The court in *Maldonado* also acknowledged its prior holding, set forth at *Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 714-730 (*Spielbauer*), that a compelled waiver of immunity could not be required even in the absence of a criminal proceeding. In this regard, our high court noted: "[W]e held that in the context of a *noncriminal investigation* by a public employer, the employee could be compelled to answer questions about his performance of duty, even without a formal immunity agreement, *so long as he was not required to surrender the immunity conferred by the Fifth Amendment itself* against use and derivative use of his statements to prosecute him for a criminal offense." (*Maldonado*, *supra*, at p. 1129, italics added.)

Neither *Maldonado* nor *Chavez* purported to overturn longstanding United States Supreme Court jurisprudence prohibiting compelled waivers of immunity. Regardless of whether the right against a compelled waiver is characterized as a "core right," a "prophylactic rule," or "complementary protection," defendant has standing to assert his Fifth Amendment claim here. The *Chavez* plurality stated this explicitly: "That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings." (*Chavez*, *supra*, 538 U.S. at p. 772, fn. 3 (plur. opn. of Thomas, J.).) For these reasons, we conclude defendant's claim under the Fifth Amendment is ripe for adjudication.

On the merits of defendant's claim, we conclude the waiver is prohibited by the Fifth Amendment. The United States Supreme Court has held that a state may not compel a probationer to waive the right to invoke the Fifth Amendment or otherwise punish a probationer for invoking its protections: "Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the

legitimate exercise of the Fifth Amendment privilege." (*Murphy*, *supra*, 465 U.S. at p. 438.) This holding was based on the United States Supreme Court's "penalty cases" jurisprudence, under which the Fifth Amendment prohibits a compelled, prospective waiver of the Fifth Amendment, even prior to and apart from any criminal proceeding. (*Lefkowitz v. Cunningham*, *supra*, 431 U.S. 801; *Lefkowitz v. Turley*, *supra*, 414 U.S. 70; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, *supra*, 392 U.S. 280, 283; *Gardner v. Broderick*, *supra*, 392 U.S. 273, 276.) These cases make clear that a compelled waiver of the privilege against self-incrimination violates the Fifth Amendment at the time the waiver is compelled.

The same protection applies to probationers. In *Murphy*, *supra*, 465 U.S. 420, the United States Supreme Court addressed the privilege against self-incrimination in the context of probation. Marshall Murphy was prosecuted for criminal sexual conduct. He pleaded guilty to false imprisonment and received three years' probation. (*Id.* at p. 422.) The terms of Murphy's probation required him to participate in a treatment program for sexual offenders and to be truthful with the probation officer "in all matters." (*Ibid.*) In the course of his treatment, Murphy confessed to raping and murdering a teenage girl seven years earlier. (*Id.* at p. 423.) His treatment counselor gave this information to the probation officer, who then confronted Murphy with it. (*Id.* at pp. 423-424.) Murphy confessed to the probation officer as well, who in turn told the police. (*Id.* at p. 424.) At no point did Murphy invoke the Fifth Amendment. He was later indicted for first degree murder for killing the teenage girl. (*Id.* at p. 425.)

The central issue in *Murphy* was whether Murphy's failure to invoke his Fifth Amendment rights allowed for the admission of his incriminating statements against him at trial. The high court concluded that Murphy had voluntarily chosen not to invoke his Fifth Amendment rights, notwithstanding the probation condition requiring him to answer questions. (*Murphy*, *supra*, 465 U.S. at pp. 433-434.) The court began its analysis by holding that the privilege against self-incrimination applies to probationers:

"A defendant does not lose this protection [against self-incrimination] by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." (*Id.* at p. 426.) The court then held that the probation condition requiring Murphy to answer questions truthfully did not, by itself, controvert this right; rather, his obligations were no different from those of any other witness in a proceeding: "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer *over his valid claim of the privilege*." (*Id.* at p. 427, italics added.) Thus, the court held that Murphy was subject to the general rule that the privilege against self-incrimination is not self-executing; rather, the privilege must be claimed by affirmatively invoking it.

The court then distinguished Murphy's circumstances from cases in which "the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege . . . ." (*Murphy*, *supra*, 465 U.S. at p. 434 [citing *Lefkowitz v. Turley*, *supra*, 414 U.S. at pp. 79-84 [state may not impose substantial penalties because a witness elects to exercise his privilege against self-incrimination]; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, *supra*, 392 U.S. at pp. 283-284; *Gardner v. Broderick*, *supra*, 392 U.S. at pp. 278-279].) The court noted: "The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony." (*Murphy*, *supra*, 465 U.S. at p. 435.) The court then held that if the state had threatened to revoke Murphy's probation for invoking the Fifth Amendment, his statements would have been inadmissible at trial. (*Ibid.*)

Thus, *Murphy* has long made clear that the state may not punish a probationer for invoking the Fifth Amendment. More recently, California courts have reaffirmed that *Murphy* stands for this principle. "[I]f the state puts questions to a probationer that call

11

for answers that would incriminate him in a pending or later criminal proceeding, and expressly or by implication asserts that invocation of the privilege would lead to revocation of probation, the answers would be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution." (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320.)  Furthermore, a threat to revoke probation for *failing to waive* the privilege against self-incrimination is tantamount to a threat to revoke probation for a "legitimate exercise of the Fifth Amendment privilege." (*Murphy*, *supra*, 465 U.S. at p. 438.)  *Murphy* thereby prohibits the compelled waiver required by section 1203.067(b)(3).

We note that even without the waiver, the state may still compel defendant to participate in treatment—even if doing so requires him to make incriminating statements—provided he retains immunity from the use of compelled statements in separate criminal proceedings.  As the court in *Murphy* observed, "a state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination.  Under such circumstances, a probationer's 'right to immunity as a result of his compelled testimony would not be at stake,' . . . ."  (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.)

The California Supreme Court recently reaffirmed this principle as applied to public employees in *Spielbauer*, *supra*, 45 Cal.4th 704 (public defender could be compelled under threat of discharge to answer questions over his claim of the privilege provided he retained immunity from prosecution).  Our high court held: "In many instances, of course, it is necessary or highly desirable to procure citizens' answers to official questions, including their formal testimony under oath.  In such circumstances, an individual's invocation of the privilege against self-incrimination would frustrate legitimate governmental objectives.  In light of the competing interests, it is well established that incriminating answers may be officially compelled, without violating the

privilege, when the person to be examined receives immunity 'coextensive with the scope of the privilege'—i.e., immunity against both direct and 'derivative' criminal use of the statements. [Citations.] In such cases, *refusals to answer are unjustified*, 'for the grant of immunity has removed the dangers against which the privilege protects. [Citation.]' " (*Id.* at pp. 714-715.) (Italics added.) And the court held that where the state's competing interests require it, the state need not issue a formal prospective grant of immunity. (*Id.* at p. 725.)

The state's interest here is at least as great as those in *Spielbauer*. This is particularly so when that interest is balanced against the rights of a probationer, who generally enjoys less constitutional protection than a public employee who is not convicted of any crime. (See *United States v. Knights* (2001) 534 U.S. 112, 119 ["Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' "].) Thus, under *Spielbauer*, a *formal* grant of immunity is not necessary to preserve defendant's rights under the Fifth Amendment during his required participation in the sex offender management program.

For these reasons, we will order the relevant language of the waiver condition stricken. The state may still compel defendant to participate in the program and in polygraph examinations as part of the program, even if doing so requires him to make incriminating statements. (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) However, if defendant claims the privilege against self-incrimination, and if the state continues to compel incriminating statements from him, then he retains immunity from the use and derivative use of his statements in any separate criminal proceeding against him. (*Id.* at p. 435.)

3. *The Dissent's Interpretation of the Penalty Exception*

In *Murphy*, the court held that "if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, *the failure to assert the privilege would be*

13

*excused,* and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Murphy*, *supra*, 465 U.S. at p. 435, italics added.) The dissent contends this so-called "penalty exception" means the waiver here is constitutional because the probationer's statements could not be used against him in a criminal proceeding. We respectfully disagree.

First, the dissent ignores the plain language of the waiver under section 1203.067(b)(3). If the waiver is valid, as the dissent asserts, then defendant has waived his ability to assert the Fifth Amendment in a subsequent criminal proceeding, and his statements would be admissible against him. (*Chavez, supra,* 538 U.S. at p. 768, fn. 2 (plur. opn. of Thomas, J.).)

Second, the dissent's argument misconstrues *Murphy*. The Supreme Court held that, under the penalty exception, "the failure to assert the privilege would be excused." (*Murphy*, *supra*, 465 U.S. at p. 435.) This is simply an exception to the general rule that the Fifth Amendment must be affirmatively invoked; it does not render a compelled waiver constitutional. Under the penalty exception, Murphy's statements would have been inadmissible precisely because a threat to revoke his probation for asserting the privilege against self-incrimination *would have violated the Fifth Amendment*. The court in *Murphy* stated this explicitly in holding that "the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." (*Id.* at p. 438.) The holding that statements made under the penalty exception are inadmissible is simply an application of the exclusionary rule as required by the Fifth Amendment violation. As pointed out above, the Supreme Court in *Murphy* based this holding on its "penalty cases" jurisprudence. (*Lefkowitz v. Cunningham*, *supra*, 431 U.S. 801; *Lefkowitz v. Turley*, *supra*, 414 U.S. 70; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, *supra*, 392 U.S. 280, 283; *Gardner v. Broderick*, *supra*, 392 U.S. 273, 276.) The dissent does not address any of these earlier cases prohibiting compelled waivers.

14

The dissent's position would also introduce a serious practical difficulty. If the waiver were left intact, then a probationer's incriminating statements would automatically be immunized under the penalty exception, even if the probationer never invoked the Fifth Amendment. This automatic grant of immunity could complicate future prosecutions, since the prosecution would bear "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (*Kastigar v. United States* (1972) 406 U.S. 441, 461-462.) By contrast, with the waiver condition stricken, a probationer must affirmatively invoke the Fifth Amendment to enjoy its protections. If defendant makes incriminating statements after failing to invoke the privilege, his statements could be used against him in a criminal prosecution without violating the Fifth Amendment. (*Murphy*, *supra*, 465 U.S. at p. 440.) If, on the other hand, defendant invokes the Fifth Amendment in response to questioning, the questioner or the probation officer would have the opportunity to consult with the district attorney on the wisdom of compelling further statements and thereby conferring immunity.

The dissent and the Attorney General adopt the position that the Fifth Amendment does not prohibit the state from requiring the probationer to answer questions as part of the treatment program, provided his answers are not used against him in a criminal prosecution. We agree with this conclusion. As we point out above, the Supreme Court has long made clear that requiring the probation to answer questions—even if doing so is incriminating—does not violate the Fifth Amendment, as long as the probationer retains immunity. (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) Furthermore, if defendant refuses to answer questions posed to him as part of the treatment program, the state can use his silence as " 'one of a number of factors to be considered by a finder of fact' in deciding whether other conditions of probation have been violated." (*Ibid.*) Nonetheless, the dissent contends the waiver condition is necessary to compel the probationer to provide "*full disclosures*" in connection with the treatment program. (Dissenting opn. at p. 1.) But the dissent does not explain why an express waiver of the Fifth Amendment is

15

necessary if requiring the probationer to answer questions *does not violate the Fifth Amendment in the first place*. In our view, the waiver is not only unconstitutional but unnecessary as well.

For these reasons, we are not persuaded by the dissent's arguments concerning the penalty exception and the necessity of the waiver condition.

4. *Waiver of the Psychotherapist-Patient Privilege*

The California Supreme Court has recognized that communications between a patient and psychotherapist are protected by a psychotherapist-patient privilege based on the federal constitutional right to privacy. "The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy." (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511 (*Stritzinger*).) "We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California statute and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut* [(1965)] 381 U.S. 479, 484, the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone." (*In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 (*Lifschutz*).)

More recently, the California Supreme Court has questioned the continuing vitality of the constitutional bases for the psychotherapist-patient privilege. "Although over 40 years have elapsed since our decision in *Lifschutz*, the United States Supreme Court itself has not yet definitively determined whether the federal Constitution embodies even a *general* right of informational privacy." (*People v. Gonzales* (2013) 56 Cal.4th 353, 384 (*Gonzales*).) Following the lead of the United States Supreme Court in *Whalen v. Roe* (1977) 429 U.S. 589 and *NASA v. Nelson* (2011) 562 U.S. 134, our high court in *Gonzales* merely assumed, without deciding, that such a right exists. (*Gonzales*, *supra*, 56 Cal.4th at p. 385.) Regardless of the analytic approach taken by these courts,

16

no court has yet overruled the holdings of *Lifschutz* and *Stritzinger*. We remain bound by them. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) Accordingly, we will proceed under the assumption that defendant enjoys the right to a psychotherapist-patient privilege based on his federal constitutional privacy rights.

"It is also well established, however, that the right to privacy is not absolute, but may yield in the furtherance of compelling state interests." (*Stritzinger*, *supra*, 34 Cal.3d at p. 511.) In *Stritzinger*, the court began by considering the state's "competing interest" in creating an exception to the privilege. (*Ibid.*) The court reaffirmed the holding of *Lifschutz* that any such exception must be narrowly construed, *ibid.*, "concomitant with the purposes of the exception." (*Lifschutz*, *supra*, 2 Cal.3d at p. 435.) These principles resemble the tailoring analysis in which a court considers whether a probation condition imposing limitations on a person's constitutional rights is closely tailored to the purpose of the condition. (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

In *Gonzales*, *supra*, 56 Cal.4th 353, the California Supreme Court recently considered the psychotherapist-patient privilege in the context of a proceeding under the Sexually Violent Predator Act (SVPA). The defendant, Ramiro Gonzales, had been convicted of multiple sex offenses over a 20-year period. (*Id.* at p. 358.) Gonzales was paroled in 2004 and he underwent psychological evaluation and treatment as a condition of parole. (*Id.* at p. 359.) After violating his parole conditions several times—including one incident in which he visited a children's playground—Gonzales was arrested and taken into custody. (*Id.* at pp. 359-360.) In 2006, the prosecution petitioned to commit Gonzales under the SVPA, and the matter was set for a jury trial.

Before trial, the prosecution sought to subpoena psychological records arising out of Gonzales' psychological treatment as a parolee. (*Gonzales*, *supra*, 56 Cal.4th at p. 361.) Gonzales moved to quash the subpoena on the basis the records were protected under the psychotherapist-patient privilege, partly relying on *Story v. Superior Court*

17

(2003) 109 Cal.App.4th 1007 (*Story*) [psychotherapy records relating to therapy sessions engaged in as a condition of probation were protected by the statutory psychotherapist-patient privilege and could not be obtained by a prosecutor who sought the records for use in a subsequent murder prosecution].) The California Supreme Court distinguished between Gonzales' statutory claim under *Story* and his claim under the federal constitutional right to privacy: "[W]e believe that in order to properly distinguish the federal constitutional issue from the state law issue, it is necessary, in determining whether the disclosure of defendant's therapy records and the admission of his therapist's testimony violated a federal constitutional right of privacy, to look to the specific nature and extent of the federal constitutional privacy interests that are actually implicated in this particular setting and to the permissible state law interests that would support the disclosure and admission of testimony in question in such a setting." (*Gonzales*, *supra*, 56 Cal.4th at p. 386.)

In this analysis, the court first noted that the constitutional privacy right invoked by Gonzales arose under the conditions of parole, and under the care of a psychotherapist funded by the state. (*Gonzales*, *supra*, 56 Cal.4th at p. 386.) The court then observed that "the federal Constitution grants states considerable leeway to impose very substantial limitations on the right of privacy retained by persons who are released on parole," citing *Samson v. California* (2006) 547 U.S. 843 (federal Constitution does not preclude a state from authorizing a search of a parolee at any time or place even in the absence of reasonable suspicion). Balanced against this "limited intrusion" of the privacy right at issue, the court held "the state has a particularly strong and legitimate interest in authorizing the disclosure and use of a parolee's prior statements that occur in parole-mandated therapy in a subsequent SVPA proceeding, especially when, as here, the parole-mandated therapy was occasioned by the parolee's prior conviction of a sex offense." (*Gonzales*, *supra*, 56 Cal.4th at pp. 387-388.) The court held disclosure was therefore supported by "a legitimate and substantial state interest," such that Gonzales'

18

federal constitutional right to the psychotherapist-patient privilege was not violated by the release of his psychological records. (*Id.* at p. 388.)

Consistent with the above principles, we consider the purpose of the waiver of the psychotherapist-patient privilege at issue here and the state's interest in compelling disclosure under it. Unlike the language of subdivision (b)(3), which mandates waiver of any privilege against self-incrimination, the wording of subdivision (b)(4) explicitly sets forth the purposes of the waiver of the psychotherapist-patient privilege: "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Section 290.09, in turn, requires communication between the sex offender management professional and the probation officer for two purposes. First, the sex offender management professional must provide the supervising probation officer with the probationer's scores on the SARATSO risk assessment tools. (Pen. Code, § 290.09, subd. (b)(2).) Second, the sex offender management professional must communicate with the probation officer about the probationer's "progress in the program and dynamic risk assessment issues." (Pen. Code, § 290.09, subd. (c).) By these provisions, the purposes of the psychotherapist-patient privilege waiver are expressly limited and comparatively well defined.

We find that the state's interest in furthering such communication is legitimate and substantial. The overriding goal of the Containment Model approach underlying the sex offender management program is public safety and the reduction of recidivism. The functioning of the model hinges in large part on open communication between the probation officer and the psychotherapist. (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements at pp. 6-8.)[4] Furthermore,

---

[4] This document is online at: <http://www.cce.csus.edu/portal/admin/handouts/CASOMB Program 10-29-13 complete.pdf> [Mar. 27, 2015]. We take judicial notice of these materials. (Evid. Code, §§ 452, 459.)

19

probationers, like the parolee in *Gonzales*, are inherently subject to a greater degree of intrusion on their rights of privacy. (*United States v. Knights*, *supra*, 534 U.S. at p. 119.) Accordingly, we conclude the state has a sufficiently substantial interest in communication between these participants to justify disclosure here.

We next consider whether the scope of the waiver is properly tailored to this interest, or whether the waiver must be more narrowly construed concomitant with the purposes of the exception. (*Stritzinger*, *supra*, 34 Cal.3d at p. 511; *Lifschutz*, *supra*, 2 Cal.3d at p. 435; *In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) Similar to the broad language used in the waiver of the privilege against self-incrimination, the language of the statute, read literally, requires the waiver of "*any* psychotherapist-patient privilege," regardless of the subject matter of the communication or the level of risk to public safety absent disclosure. The waiver does not distinguish between comparatively more dangerous or less dangerous probationers. But unlike the language of the waiver of the privilege against self-incrimination, this broad language is followed by the phrase: "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." This additional language limits what may be done with the probationer's communications once they are revealed.

We will therefore narrowly construe the statute as requiring a waiver of the psychotherapist-patient privilege only insofar as it is necessary "to enable communication between the sex offender management professional and supervising probation officer . . . ." (Pen. Code, § 1203.067, subd. (b)(4).) Specifically, we hold that defendant may constitutionally be required to waive the psychotherapist-patient privilege only to the extent necessary to allow the sex offender management professional to communicate with the supervising probation officer. Furthermore, the supervising probation officer may communicate defendant's scores on the SARATSO risk assessment tools to the Department of Justice to be made accessible to law enforcement as required under section 290.09, subdivision (b)(2). This narrow interpretation of the statute allows the

psychotherapist to communicate with the probation officer as necessary, furthering the purposes of the exception as set forth in the statute. Apart from these exceptions, neither the psychotherapist nor the probation officer may relay protected communications to some other third party under the waiver, and defendant's privacy rights based on the psychotherapist-patient privilege otherwise remain intact.[5]

### III.    DISPOSITION

In light of our holding that the waiver requirement in Penal Code section 1203.067, subdivision (b)(3) is unconstitutional, we strike the language "waive any privilege against self-incrimination and" from the probation condition implementing that subdivision. As modified, the judgment is affirmed.

---

[5] Defendant also argues that section 1203.067(b)(4) violates the general statutory psychotherapist-patient privilege created by Evidence Code section 1014. To the extent the statutes conflict, it is the later, more specific statute that controls. (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1550, quoting *Young v. Haines* (1986) 41 Cal.3d 883, 894; *Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.)

_____

Márquez, J.

RUSHING, P.J., Concurring

I agree with the majority opinion that defendant cannot be compelled to waive his immunity against self-incrimination, although he can be compelled to answer potentially incriminating questions, on pain of revocation of probation, so long as his answers cannot be used against him. I diverge somewhat from the majority opinion's approach, however, concerning the effect of defendant's statutorily required waiver of the psychotherapist-patient privilege. I believe California's express guarantee of the right of privacy (Cal. Const., art. I, § 1) compels a rule under which the waiver required by Penal Code section 1203.067, subdivision (b), permits the "sex offender management professional" to report to the probation officer upon the defendant's test scores, attendance, and general cooperativeness in the therapy process, but does not otherwise permit the professional to disclose, to the probation officer or anyone else, the content of any otherwise protected psychotherapeutic communications. To the extent Penal Code section 1203.067 may be understood or intended to require or permit disclosure of such communications, I would hold it violative of our state constitutional guarantee of privacy.


_____
RUSHING, P.J.

ELIA, J., Dissenting

I respectfully disagree with the majority's conclusion that the probation condition requiring defendant to waive the privilege against self-incrimination (Pen. Code, § 1203.067, subdivision (b)(3))[1] is prohibited by the Fifth Amendment under *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*), and therefore this court must strike the condition. (Maj. opin. p. 2.) In addition, I would not narrowly construe the waiver of the psychotherapist-patient privilege.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." However, the Fifth Amendment does not prohibit the state from requiring a prospective probationer to choose between accepting this waiver and going to prison. This is true because the probation condition requiring defendant to waive the privilege against self-incrimination does not *itself* compel a probationer to be a witness against himself in *a criminal proceeding*. This condition requires only that the probationer provide *full disclosures* in connection with the sex offender management program. Such disclosures are necessary to the success of the program. The waiver provision is critical because it prevents a probationer from refusing to provide such disclosures on self-incrimination grounds.

In *Murphy*, *supra*, 465 U.S. 420 the defendant, Murphy, had been placed on probation for a sexual offense. His probation terms required him to participate in a sex offender treatment program, and to be "truthful with the probation officer 'in all matters.' " (*Id*. at p. 422.) A counselor in the treatment program told the probation officer that Murphy had admitted an unrelated rape and murder. (*Id*. at p. 423.) The probation officer confronted Murphy about these admissions. (*Id*. at pp. 423-424.) Again, Murphy admitted the rape and murder. (*Id*. at p. 424.) Thereafter, Murphy was charged with murder, and he sought to suppress his admissions to the probation officer on

---

[1]     All unspecified section references are to the Penal Code.

Fifth Amendment grounds. (*Id*. at pp. 424-425.) The Minnesota Supreme Court held that, because the defendant was required to respond truthfully to the probation officer, the probation officer was required to inform the defendant of his Fifth Amendment rights before questioning him, and her failure to do so merited suppression of his admissions. (*Id*. at p. 425.)

The United States Supreme Court granted certiorari to decide "whether a statement made by a probationer to his probation officer without prior warnings is admissible in a subsequent criminal proceeding." (*Murphy*, *supra*, 465 U.S. at p. 425.) The Supreme Court concluded that the "general rule" is that the Fifth Amendment privilege against self-incrimination is not "self-executing." (*Id*. at p. 434.) A privilege that is not "self-executing" applies only where it has been invoked. (*Ibid*.) Murphy had not invoked the privilege because he did not "assert the privilege rather than answer" the probation officer's questions. (*Id*. at p. 429.) The court rejected Murphy's claim that his obligation under the terms of his probation to truthfully answer his probation officer's questions alone converted his "otherwise voluntary" responses into compelled statements. (*Id*. at p. 427.) Analogizing Murphy's situation to that of a subpoenaed witness who testifies on pain of contempt, the court observed that "[t]he answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." (*Ibid*.) "If he asserts the privilege, he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding. [Citation.] But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." (*Id*. at p. 429.)

In *Murphy*, the United States Supreme Court considered the applicability of the "penalty exception" to the general rule that the Fifth Amendment is not "self-executing."

2

The penalty exception applies where the state not only compelled the person's statements but also "sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' " (*Murphy*, *supra*, 465 U.S. at p. 434.) "A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Id*. at p. 435.) Yet even in the "classic penalty situation," the probationer's compelled statements would still be admissible in a probation revocation hearing, as that is not a criminal proceeding and the Fifth Amendment is therefore inapplicable. (*Ibid*., & fn. 7.) Murphy's statements did not fall within the penalty exception. "On its face, Murphy's probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." (*Id*. at p. 437.) Hence, his statements to the probation officer were admissible against him in a criminal prosecution.

In *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112 (*Maldonado*), the California Supreme Court rejected the defendant's claim that the Fifth Amendment provided "a guarantee against officially compelled *disclosure* of potentially self-incriminating information." (*Id*. at p. 1127.) The *Maldonado* court based its holding on the rule that the Fifth Amendment applies only to *use* of a defendant's incriminating

3

statements; the Fifth Amendment does not bar the government from compelling those statements. "[T]he Fifth Amendment does not provide a privilege against the compelled 'disclosure' of self-incriminating materials or information, but only precludes the use of such evidence in a criminal prosecution against the person from whom it was compelled." (*Id*. at p. 1134.) "[T]he Fifth Amendment privilege against self-incrimination does not target the mere compelled *disclosure* of privileged information, but the ultimate *use* of any such disclosure in aid of a criminal prosecution against the person from whom such information was elicited." (*Id*. at p. 1137.)

The California Supreme Court's decision in *Maldonado* relied on the United States Supreme Court's decision in *Chavez v. Martinez* (2003) 538 U.S. 760 (*Chavez*). *Chavez* was a civil action involving qualified immunity in which the issue was whether a police officer who allegedly compelled statements from the plaintiff could be held liable for violating the plaintiff's civil rights. The plaintiff claimed that the police officer had violated the Fifth Amendment. The United States Supreme Court produced a plurality opinion and multiple separate opinions rejecting the plaintiff's theory. Justice Thomas wrote the lead opinion. In a section of his opinion joined by three other justices, Justice Thomas stated that compelled statements "of course may not be used against a defendant at trial, [citation], but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." (*Id*. at p. 767.) "[M]ere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." (*Id*. at p. 769.) Writing separately, Justice Souter acknowledged that it would be "well outside the core of Fifth Amendment protection" to find that "questioning alone" was a "completed violation" of the Fifth Amendment and declined to extend the Fifth Amendment to such a claim. (*Id*. at p. 777.) Thus, in *Chavez*, five justices held that the Fifth Amendment is not violated by the extraction of compelled statements.

4

As applied to this case, *Murphy* establishes that defendant's Fifth Amendment rights are not violated by the probation condition requiring him to waive the privilege against self-incrimination as to questions asked during the sex offender management program. The state has, "by implication, assert[ed] that invocation of the privilege" in response to such incriminating questions "would lead to revocation" of probation. (See *Murphy*, *supra*, 465 U.S. at p. 435.) Thus, if defendant makes any statements in response to questions posed to him during the sex offender management program, those statements will be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution. (*Ibid.*) In short, since such statements will necessarily fall within the penalty exception, they will not be available for use at a criminal prosecution, and defendant's Fifth Amendment rights have not been violated. (See *Chavez*, *supra*, 538 U.S. at p. 769 [plur. opn. of Thomas, J.] [the Fifth Amendment is not violated absent use of the compelled statements in a criminal case against the witness]; *id*. at p. 777 [conc. opn. of Souter, J.].)

In sum, I believe that we are bound by *Maldonado* and *Chavez* (see *Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455), and they hold that the mere extraction of compelled statements does not violate the Fifth Amendment. Since the challenged probation condition does not purport to authorize the *use* of any statements against defendant in a criminal proceeding, it does not violate the Fifth Amendment.

Simply put, because the penalty exception will necessarily apply to statements that defendant makes in response to questions asked as part of the sex offender management program under compulsion of the section 1203.067, subdivision (b)(3) probation condition, the condition itself does not violate the Fifth Amendment.

As to the waiver of the psychotherapist-patient privilege, in the Sex Offender Punishment Control and Containment Act of 2006 (§ 290.03), the "Legislature [found] and declare[d] that a comprehensive system of risk assessment, supervision, monitoring and containment for registered sex offenders residing in California communities is

5

necessary to enhance public safety and reduce the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

Accordingly, the Legislature amended section 1203.067 to provide a collaborative approach to sex offender management known as the "Containment Model." As the analysis of Assembly Bill 1844 explains, "The Containment Model calls for a collaborative effort of sex offender specific treatment providers, law enforcement supervising agents such as probation officers or parole agents, polygraphists providing specialized testing as both a treatment and monitoring tool and victim advocacy participants whenever possible. The offender is supervised and overseen within this context." (Sen. Com. on Public Safety, Bill Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) June 29, 2010, available on line at <http://www.leginfo.ca.gov/pub/09-10/bill/asm/ab_1801-1850/ab_1844_cfa_20100628_1 41315_sen_comm.html>.)

As of July 1, 2012, the Containment Model is mandatory. (§§ 290.09, 1203.067, 3008 & 9003.)

The Legislature has explained that the purpose of the waiver of the psychotherapist-patient privilege is to "enable communication between the sex offender management professional and supervising probation officer." (§ 1203.067, subd. (b)(4).) Such a waiver supports the compelling state interest in "enhanc[ing] public safety and reduc[ing] the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

Since the Containment Model calls for a collaborative effort of sex offender specific treatment providers, which includes polygraphists providing specialized testing as both a treatment and monitoring tool, limiting disclosures to the probation officer would effectively eliminate such a treatment and monitoring tool. The substance of the psychotherapist-patient communications may require verification or investigation by the polygraphists.

6

Simply put, for the Containment Model of sex offender management to be effective, there must be open and ongoing communication between *all* professionals responsible for supervising, assessing, evaluating, treating, supporting, and monitoring sex offenders. The absence of open and ongoing communication between these professionals and other involved persons, could compromise the purpose of the containment team approach and as a result jeopardize the safety of the community. Accordingly, I would not construe the waiver of the psychotherapist-patient waiver as narrowly as does the majority.

_____

ELIA, J.